*This opinion is subject to revision before final publication in the Pacific Reporter*

**2019 UT 16**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

DON BRADY, SINNIKKA BRADY, DON BRADY INTERIOR DESIGN,
and FINNISH TOUCH DAY SPA,
*Appellees and Cross-Appellants,*

*v.*

KANG S. PARK, KANG SIK PARK,
and BANK OF UTAH,
*Appellants and Cross-Appellees.*

No. 20160425
Filed May 8, 2019

On Direct Appeal

Third District, Salt Lake
The Honorable Robert P. Faust
No. 060917206

Attorneys:

J. Michael Gottfredson, Mark F. James, Mitchell A. Stephens,
Salt Lake City, for appellees and cross-appellants

Troy L. Booher, Clemens A. Landau, Salt Lake City, for appellants
and cross-appellees

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which
JUSTICE PEARCE and JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE and JUDGE CONNORS joined in the
majority as to Sections II, III, IV, V, VI, and VII.

ASSOCIATE CHIEF JUSTICE LEE authored a dissenting opinion as to
Section I.B.

JUDGE CONNORS authored a dissenting opinion as to Section I.

Having Recused Himself, JUSTICE HIMONAS does not participant
herein. DISTRICT COURT JUDGE DAVID CONNORS sat.

CHIEF JUSTICE DURRANT, opinion of the Court:

**Introduction**

¶1   This is the latest chapter in a contract dispute that began nearly twenty years ago. The parties' dispute stems from a seller-financed real estate transaction in 1996. On one side are Kang S. Park (the seller-financer), his trust (represented by Mr. Park as trustee), and the Bank of Utah (the custodian of Mr. Park's IRA account) (collectively, Park Defendants). On the other side are the Bradys (the buyers). The Bradys purchased the real estate in question with two promissory notes. One of the notes required the Bradys to make an installment payment each month, in the amount of $5,923.61, from January 1, 1997 to October 1, 2006; and a final balloon payment, consisting of the remaining unpaid principal and accrued interest, on October 31, 2006. The note applied a 10 percent base interest rate on the unpaid principal. And it established two consequences in the event the Bradys missed an installment payment: (1) a late fee (equal to 10 percent of the missed installment payment), and (2) a bump up in the base interest rate (10 percent) to a default interest rate (20 percent) until the note was "brought current."

¶2   Although the Bradys made monthly installment payments throughout the life of the note, when the time came to pay the final balloon payment, the parties disagreed over the amount owing. The Bradys filed suit for declaratory relief in 2006 and have been locked in litigation ever since.

¶3   Most of the disagreements between the parties relate to the manner in which the amount owed is calculated. Although many disputed issues have been resolved through two rounds of litigation in the district court and one round in the court of appeals, the parties now ask us to resolve seven final issues.

¶4   The first and most important issue is what the note's 20 percent default interest provision requires in order to be "brought current," thereby returning the note's interest rate back to a base 10 percent rate after a missed installment payment had bumped up the interest rate to the 20 percent default rate. Because the currency of the note determines when, and for how long, 20 percent default interest accrued throughout the ten year life of the note, our resolution of this issue will significantly affect the amounts owed under the note.

¶5   The Bradys argue that the note's currency is exclusively tied to the monthly installment payments. In other words, they argue

that the 20 percent default interest begins accruing when an installment payment becomes late, and it stops once the late installment payment is paid. During a previous appeal, the Park Defendants argued that, in addition to late installment payments, the note also required the Bradys to pay any of the additional, accrued default interest to bring it current. This issue was resolved by the court of appeals in a decision upon which we denied certiorari review.[1] On remand, the Park Defendants argued that the note is not current if there is any unpaid 10 percent penalty fee amount. But the district court rejected this argument.

¶6   The Park Defendants now argue that the mandate rule precluded the district court from reaching this question. We hold that the district court was not so precluded. The Park Defendants also argue that the district court erred in determining that the 10 percent late fee need not be paid to bring the note current. We hold that the district court erred in deciding this issue by construing an ambiguity in the note against the Park Defendants, as drafters, without first considering extrinsic evidence. Accordingly, we remand this question to the district court for a new determination after considering relevant extrinsic evidence.

¶7   The second issue before us is whether the note's 10 percent late fee provision applies to the final balloon payment. The district court, after considering extrinsic evidence, held that it did not and that it would be unconscionable if it did. The Park Defendants challenge both determinations. We affirm the court's interpretation of the note on this point because it was not clearly erroneous. Because our resolution of this issue renders a consideration of the unconscionability issue unnecessary, we decline to address it.

¶8   The third issue before us is whether the district court violated the mandate rule when it applied installment payment dates differing from the court's previously accepted payment dates. We hold that it did. Accordingly, we reverse the district court's payment date determination and remand for a new accounting in accordance with the pre-appeal payment dates.

---

[1] The court of appeals held that the note did not require the Bradys to pay off any of the additional, 20 percent default interest that accrued after a missed installment payment to bring the note current. *Brady v. Park*, 2013 UT App 97, ¶ 36, 302 P.3d 1220.

¶9    The fourth issue before us is whether the district court erred when it awarded pre- and postjudgment interest to the Bradys at a rate of 10 percent. The Park Defendants argue that this was not authorized under the plain language of Utah Code sections 15-1-1 and 15-1-4. We agree. Accordingly, we reverse and remand to the district court for an entry of default interest at an appropriate rate.

¶10  The fifth issue is whether the district court erred in denying the Park Defendants' rule 60(b) motion. The Park Defendants argue that the district court erred by failing to remove the "joint and several" designation from the final judgment because two of the Park Defendants—Paul M. Halliday, as trustee of two trust deeds,[2] and the Bank of Utah, as custodian of Mr. Park's IRA account—were in the litigation only as part of a claim for injunctive relief. We hold that the district court's ruling on the rule 60(b) motion was not clearly erroneous, so we affirm.

¶11  The sixth issue on appeal is raised by both parties. After the latest round of litigation, the district court concluded that neither party had prevailed and, therefore, neither party was entitled to attorney fees. Because our rulings on the other issues in this case may have upended the basis for the court's attorney fees decision, we remand for a new attorney fees determination.

¶12  The seventh and final issue is raised by the Bradys. They assert that we do not have jurisdiction over Mr. Park's IRA, because the Bank of Utah, as custodian of Mr. Park's IRA, failed to file a timely notice of appeal. We hold that even though we do not have jurisdiction over the Bank of Utah, our jurisdiction over the IRA's owner and beneficiary necessarily includes jurisdiction over the IRA.

## Background

¶13  Don and Sinnika Brady purchased commercial property from Kang S. Park[3] in 1996 for $755,625. The Bradys paid Mr. Park in the form of two promissory notes. The smaller note was for $80,625

---

[2]  Although Mr. Halliday was included as one of the Park Defendants below, he has disclaimed his interest in these proceedings and does not participate in this appeal.

[3]  Mr. Park later assigned his interest in the transaction to the Kang Sik Park MD PC Profit Sharing Plan, which later assigned it to the Kang Sik Park Rollover IRA. Defendant Bank of Utah is the custodian of the IRA.

and the larger was for $675,000. Each note was secured by two trust deeds: one on the commercial property and one on a Summit County investment property owned by the Bradys. Only the larger note (Note) is at issue here. The Note bore interest at a rate of 10 percent per year on the unpaid principal. Under the terms of the Note, the Bradys were required to make monthly payments of $5,923.61 starting on January 1, 1997, and a final balloon payment on October 31, 2006 consisting of "the entire principal balance together with interest thereon." Importantly, the Note specified two consequences for a late payment—a 10 percent late fee and a bump up to a 20 percent default interest rate:

> If payment is not made within five (5) days of due date, a late fee of 10 percent will be due. If payment is not made within 5 days of due date the entire balance shall bear interest at the rate of 20% until note is brought current.

The Note was prepared by a title company, but the 20 percent default interest provision was included at Mr. Park's request.

¶14 The Bradys made the first three payments on time, but made the April 1, 1997 payment late. On May 2, 1997, they made a double payment comprising the April and May payments plus a 10 percent late fee (10 percent of the late installment payment) for the April payment. But they did not pay off any of the default interest that had accrued from the date the payment was due until the date the late installment payment was paid. The Bradys made other payments late, but ultimately made every monthly installment payment. Seeking to refinance the Note, and believing their payments had kept the Note current, the Bradys approached Mr. Park through a bank loan officer in 2000 to obtain a payoff amount.

¶15 According to the Bradys, Mr. Park did not respond to their payoff request until 2002, when he provided a payoff amount between $1.4 million and $1.5 million. That is when the Bradys first learned that Mr. Park believed the Note had not been current, and had been accruing interest at a 20 percent rate, since March 1997. The Bradys disputed Mr. Park's calculation and over the next four years asked Mr. Park for a corrected payoff amount. They claim Mr. Park did not respond until October 18, 2006—thirteen days before the balloon payment was due—when he notified the Bradys that the payoff amount was $2,585,398. Mr. Park calculated these amounts based on his assumption that the Note had not been current since the March 1997 payment, so it had been accruing interest at a 20 percent rate.

¶16 After receiving the October 2006 payoff calculation, the Bradys sued Mr. Park to receive a judicial determination of the amounts owed on the Note. The Bradys also alleged a number of other claims, including a request for injunctive relief[4] against the Bank of Utah, as custodian of Mr. Park's IRA, and Paul M. Halliday, as trustee of two trust deeds securing the Note. They also sought damages for Mr. Park's alleged refusal to accept their tenders of payment. The Park Defendants counter-sued with a number of contract-related claims, including breach of contract.

¶17 After a bench trial, the district court ruled, among other things, that the Note required the Bradys, in order to bring the Note current, to pay off any default interest that accrued after late payments. As a result, the court concluded that the 20 percent default interest had been accruing since March 1997. The district court also ruled that the Note called for the interest to be compounded annually during the delinquent period, and that the 10 percent late fee for a late installment payment constituted an unconscionable penalty.

¶18 The district court then instructed the parties to find a third-party expert accountant to calculate the remaining amount owed on the Note in accordance with the court's legal conclusions. It explained that the designated accountant should consider the installment payment date to be the date that Mr. Park actually received the checks. The court noted, however, that the delivery dates for some of the checks were unclear because Mr. Park had allowed those checks to accumulate before depositing them as a group. So for the accumulated checks, the court instructed the designated accountant to consider the payment date to be the date the checks were sent.

¶19 The parties selected Rick Hoffman to perform the Note calculations. As part of his calculations, Mr. Hoffman determined the date of each installment payment and applied interest at a 20 percent rate, compounding annually, from March 1997 to June 30, 2010. He did not include any amounts for late fees.

¶20 The district court incorporated Mr. Hoffman's findings into its February 2, 2011 findings of fact and conclusions of law by

---

[4] The Bradys requested that the court prohibit the Park Defendants "from foreclosing on the subject properties until such time as the correct amount due under the notes is determined."

awarding judgment in the amount Mr. Hoffman had calculated and stating that the "amount was determined in accordance with the Court's direction and the Parties' stipulation in selecting Mr. Rick Hoffman to perform this calculation." The final judgment amount was $2,440,845.

¶21 The parties appealed the district court's determination. The Bradys challenged the court's conclusions that the Note called for compound interest, that the accrued 20 percent default interest had to be paid to stop further accrual of default interest, and that the 20 percent default interest provision was conscionable. The Park Defendants, on the other hand, challenged the court's rulings that the 10 percent late fee provision was unconscionable and that the interest compounded annually rather than monthly. Importantly, neither party challenged the court's legal determinations or Mr. Hoffman's factual findings related to the payment dates.

¶22 The court of appeals subsequently issued an opinion deciding these issues.[5] It reversed the district court's decision on two points. It concluded, first, that the Note called for simple rather than compound interest[6] and, second, that the Note did not require the Bradys to pay the accrued 20 percent default interest to stop the accrual of additional default interest.[7] The court also concluded that the district court erred when it ruled that the 10 percent late fee provision was unconscionable because it had failed to evaluate the provision using the standard we set out in *Commercial Real Estate Investment, L.C. v. Comcast of Utah II, Inc.*[8] As a result, it remanded the case back to the district court to resolve four issues:

> (1) whether the challenged provision is unconscionable under *Commercial Real Estate* as applied to installment payments, (2) if not, which installment payments generated a late fee, (3) whether the late fee provision applies to the [Note's final] balloon payment, and (4) if so, whether that application of the late fee is unconscionable.[9]

---

[5] *Brady v. Park*, 2013 UT App 97, 302 P.3d 1220.

[6] *Id.* ¶ 21.

[7] *Id.* ¶ 36.

[8] 2012 UT 49, 285 P.3d 1193.

[9] *Brady*, 2013 UT App 97, ¶ 27.

¶23 On remand, the district court applied the *Commercial Real Estate* test and concluded that the 10 percent late fee provision was conscionable, that the 10 percent late fee provision did not apply to the Note's balloon payment, and that, even if it did, its application to the final balloon payment would be unconscionable. It also concluded that the district court's pre-appeal instructions regarding the payment dates had not been appealed and would "remain the law applicable in this case." Finally, it requested the parties to submit accountings consistent with its order.

¶24 Both parties submitted proposed accountings, but their calculations differed drastically from each other. Under the Park Defendants' accounting, the Bradys still owed $785,977.01, and under the Bradys' accounting, the Bradys' had overpaid Mr. Park by $256,255.00—a discrepancy of $1,042,232.01.

¶25 The wide gap between each party's calculation was due, in part, to a disagreement regarding whether the 10 percent late fee had to be paid with each late installment payment or at the end with the final balloon payment. Mr. Park argued that it became due upon each default, so it had to be paid with the late installment payment to bring the Note current, thereby stopping the accrual of 20 percent default interest. The Bradys, in contrast, argued that late fees were not due until the final balloon payment. After considering these arguments, the district court agreed with the Bradys and held that only the late installment payment needed to be paid to bring the Note current.

¶26 The parties also disagreed over the dates of the installment payments. The Park Defendants' accountant incorporated Mr. Hoffman's original payment dates into his calculation, but the Bradys' accountant made his calculation using different dates.[10] The Park Defendants urged the district court to adopt their proposed accounting because it was "consistent with the previous undisturbed findings in this case," whereas the accounting submitted by the Bradys' accountant contained "a number of errors inconsistent with the record." Although the district court considered the Park Defendants' arguments, it ultimately accepted the Bradys' proposed accounting and issued final judgment to the Bradys in the amount of

---

[10] It appears that the Bradys' accountant simply used the dates on the face of the checks as the payment date for all of the checks—a method the district court's pre-appeal decision prohibited.

$256,255.00. Additionally, the court declined to award attorney fees to either party, but awarded pre- and postjudgment interest at the rate of 10 percent per annum pursuant to Utah Code sections 15-1-1 and 15-1-4.

¶27 The court awarded the judgment amount joint and severally against the Park Defendants. The Park Defendants filed a motion pursuant to rule 60(b) of the Utah Rules of Civil Procedure to remove the joint and several designation from the Bank of Utah and Paul M. Halliday. The motion was brought on the ground that the Bank of Utah—as custodian of Mr. Park's IRA—and Mr. Halliday—as trustee of two trust deeds securing the Note—had been joined in the case only as defendants to the Bradys' claim for injunctive relief. According to the Park Defendants, the court could not now award monetary damages against the Bank of Utah and Mr. Halliday because the Bradys' never alleged any monetary damages against them in their complaint. The Bradys argued, however, that the joint and several designation was appropriate because the Note was held in Mr. Park's IRA account—of which the Bank of Utah is the custodian. They also argued that it was appropriate because the Bank of Utah, acting on behalf of the IRA, had used the pre-appeal judgment[11] to foreclose on the Bradys' real property. The district court issued a two-sentence order denying the rule 60(b) motion.

¶28 The Park Defendants appeal the judgment and the district court's denial of the rule 60 motion. We have jurisdiction pursuant to Utah Code section 78A-3-102(3)(j).

### Standards of Review

¶29 The first and second issues require us to consider the district court's interpretation of a contract. We review a district court's interpretation of a contract for correctness.[12] But if a contract term is ambiguous, district courts should consider extrinsic evidence to resolve the ambiguity.[13] If a district court makes a determination of

---

[11] This judgment was overturned by the court of appeals decision in this case.

[12] *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 15, 367 P.3d 994.

[13] *See Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the [fact-finder].

(Continued)

the parties' intent after considering extrinsic evidence, this is a factual determination to which we grant deference.[14] So if the court's decision hinges upon extrinsic evidence, it should be overturned only if clearly erroneous.[15]

¶30 Third, we consider whether the district court violated the mandate rule. We review a district court's holdings regarding the mandate rule for correctness.[16]

¶31 Fourth, we consider the district court's decision to award pre- and postjudgment interest. We review a district court's decision in this regard for correctness.[17]

¶32 Fifth, we consider the district court's decision to award no attorney fees. We review a district court's determination of which party is the prevailing party under an abuse of discretion standard.[18] But legal questions that pertain to the attorney fees issue, such as the proper interpretation of the Note at issue here, are reviewed for correctness.[19]

¶33 Sixth, we consider the district court's rule 60(b) determination. We conduct this review under an abuse of discretion standard.[20]

¶34 Finally, we consider our jurisdiction over the Bank of Utah, as custodian of Mr. Park's IRA. The question of whether we have jurisdiction over an appeal is a question of law.[21]

---

Failure to resolve an ambiguity by determining the parties' intent from parol evidence is error."(citation omitted)).

[14] *Watkins v. Ford*, 2013 UT 31, ¶ 19, 304 P.3d 841.

[15] *In re Adoption of Baby B.*, 2012 UT 35, ¶ 40, 308 P.3d 382.

[16] *Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 8, 218 P.3d 583.

[17] *Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 11, 210 P.3d 263 (stating the standard of review for decisions to award prejudgment interest); *Bailey-Allen Co. v. Kurzet*, 876 P.2d 421, 427 (Utah Ct. App. 1994) ("We review the award of postjudgment interest, a question of law, under the correction of error standard.").

[18] *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 25, 40 P.3d 1119.

[19] *Robertson v. Gem Ins. Co.*, 828 P.2d 496, 499 (Utah Ct. App. 1992).

[20] *Metro. Water Dist. of Salt Lake & Sandy v. Sorf*, 2013 UT 27, ¶ 12, 304 P.3d 824.

**Analysis**

¶35 The parties raise seven issues on appeal. First, the Park Defendants argue that the district court erred in interpreting the Note as providing that the 10 percent late fee amounts need not be paid to bring the Note current. They argue that the court erred in making this interpretation because it violated the mandate rule. We disagree. They also argue that, even if it did not violate the mandate rule, the court's interpretation of the Note was incorrect. Although we agree with the district court that the Note is ambiguous on this point, we hold that the court erred in deciding this issue because it construed the ambiguity against the Park Defendants, as drafters, without first considering extrinsic evidence. Accordingly, we reverse the district court's decision on this point and remand for a new determination after the court considers relevant extrinsic evidence.

¶36 The Park Defendants also challenge the district court's interpretation of the Note's 10 percent late fee provision as it relates to the final balloon payment. We affirm the court's finding, because it was not clearly erroneous, that extrinsic evidence showed that the parties did not intend the 10 percent late fee provision to apply to the final balloon payment.

¶37 Next, the Park Defendants argue that the district court violated the mandate rule by accepting payment dates that differed from payment dates accepted by the pre-appeal district court. We agree. Accordingly, we reverse the court's payment date determination and remand for an accounting consistent with the pre-appeal payment dates.

¶38 Furthermore, the Park Defendants challenge the district court's determination regarding pre- and postjudgment interest and its rule 60(b) ruling. We affirm the court's rule 60(b) ruling, but reverse its pre- and postjudgment interest determination and remand for an award of interest at a more appropriate interest rate.

¶39 Additionally, both parties challenge the district court's attorney fees determination. Because our holdings regarding the other issues in this case may have upended the basis for the court's attorney fees decision, we remand for a new attorney fees determination.

¶40 Finally, the Bradys claim that we do not have jurisdiction over Mr. Park's IRA, because the Bank of Utah, as custodian for

---

[21] *In re Adoption of A.B.*, 2010 UT 55, ¶ 21, 245 P.3d 711.

Mr. Park's IRA, failed to file a timely notice of appeal. We hold that we have jurisdiction over the IRA through its owner, even though we do not have jurisdiction over the Bank of Utah.

¶41   We discuss the merits of each issue in turn.

### I. The District Court Did Not Violate the Mandate Rule by Determining that the Note Did Not Require the 10 Percent Late Fees to be Paid to Bring the Note Current, But Erred in Making This Determination By Construing an Ambiguity in the Note Against the Park Defendants Without First Considering Relevant Extrinsic Evidence

¶42   The district court determined that the Note did not require the Bradys to pay unpaid 10 percent late fee amounts to bring the Note current. The Park Defendants argue that the court erred in making this determination for two reasons. First, they assert that it violated the mandate rule—a subcategory of the law of the case doctrine. Second, they argue that the court's interpretation of the Note was incorrect. Although we hold that the district court was not precluded by the mandate rule from deciding this issue, we hold that the court erred in deciding this issue by construing the ambiguity in the Note against the Park Defendants, as drafters, without first considering relevant extrinsic evidence.

*A. The district court did not violate the mandate rule when it determined that the 10 percent late fees were not required to be paid to bring the Note current*

¶43 First, the Park Defendants argue that the district court violated the mandate rule when it determined that the Note did not require the 10 percent late fees to be paid to bring the Note current, thereby stopping the accrual of the 20 percent default interest. Because neither the pre-appeal district court nor the court of appeals had previously decided this issue, we hold that it never became the law of the case under the mandate rule, and so the district court on remand was free to decide the issue.

¶44 The "[l]aw of the case terminology has been applied to a number of distinct sets of problems, each with a separate analysis."[22] For example, "[i]n the initial stages of litigation . . . this rule has

---

[22] *Thurston v. Box Elder Cty.*, 892 P.2d 1034, 1037 (Utah 1995).

reference only to the parties to the case."[23] So "[w]hile a case remains pending before the district court *prior to any appeal*, the parties are bound by the court's prior decision, but the court remains free to reconsider that decision."[24]

¶45  But after a "case has been appealed and remanded," the law of the case becomes binding upon the district court under what is commonly referred to as the mandate rule.[25] The mandate rule "dictates that pronouncements of an appellate court on legal issues"[26] and "prior decision[s] of a district court become[] mandatory after an appeal and remand."[27] This branch of the law of the case doctrine "serves the dual purpose of protecting against the reargument of settled issues and of assuring adherence of lower courts to the decisions of higher courts."[28]

¶46  The mandate rule is especially important in a case, such as this, that involves parties locked in seemingly endless cycles of litigation.[29] For this reason, we will enforce the mandate rule if the district court disturbed any of its pre-appeal factual findings or legal conclusions, or a legal determination of the court of appeals. But because neither the pre-appeal district court, nor the court of

---

[23] *Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 12, 216 P.3d 352.

[24] *Id.* (emphasis added) (citation omitted); *see also* UTAH R. CIV. P. 54(b) ("[A]ny order or other decision, however designated, that adjudicates fewer than all the claims . . . may be changed at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.").

[25] *Mid-America Pipeline*, 2009 UT 43, ¶ 13.

[26] *Thurston*, 892 P.2d at 1037.

[27] *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 28, 196 P.3d 588.

[28] *Thurston*, 892 P.2d at 1038.

[29] *See Gildea v. Guardian Title Co. of Utah*, 2001 UT 75, ¶ 9, 31 P.3d 543 ("The doctrine was developed to promote the obedience of inferior courts as well as 'to avoid the delays and difficulties involved in repetitious contentions and reconsideration of rulings on matters previously decided in the same case.'" (citation omitted)).

appeals, had previously determined this issue, the district court on remand was free to reach it.

¶47 Before the first appeal, the district court never reached the question of whether the 10 percent late fee must be paid to bring the Note current, because it ruled that the late fee was unconscionable and thus unenforceable. The court of appeals considered the district court's unconscionability determination, but because the court of appeals held that the district court had applied the wrong legal test, it remanded the case to the district court so that it could make a new unconscionability determination using the test we established in *Commercial Real Estate Investment, L.C. v. Comcast of Utah II, Inc.*[30] Consequently, the court of appeals never discussed the effect the payment of the 10 percent late fee would have on the accrual of default interest.

¶48 The Park Defendants maintain, however, that at one point in the opinion the court of appeals ruled that the payment of the 10 percent late fee would be paid "together" with late installment payments. But when this comment is viewed in context of the opinion as a whole, it is clear that the court was not attempting to make a legal determination regarding the due date of the late fees or their effect on the accrual of default interest.

¶49 The court of appeals made the comment in considering the separate issue of whether the Note required the Bradys to pay off any of the already accrued default interest in order to bring the Note current, thereby stopping the accrual of additional default interest. During this discussion, the court stated that "payment of the accrued default interest was not required to bring the Note current," and so "the 20% default interest rate runs from the expiration of the five-day grace period until the payment was made, *together with the 10% late fee* (if the trial court determines on remand that the 10% late fee is enforceable)."[31]

¶50 The Park Defendants argue that the "together with the 10% late fee" language constituted a determination that the 10 percent late fee had to be paid to bring the Note current. But we disagree. It is unlikely that by making this comment the court of appeals

---

[30] 2012 UT 49, 285 P.3d 1193.

[31] *Brady v. Park*, 2013 UT App 97, ¶ 36, 302 P.3d 1220 (emphasis added).

intended to rule on this issue because the issue had not been presented and briefed by the parties.[32]

¶51 Because the district court ruled that the 10 percent late fee provision was unconscionable before the first appeal, it did not decide whether a late fee incurred under that provision had to be paid to bring the Note current. Consequently, there was no order for the parties to challenge and, as a result, the parties did not brief this issue for appeal. For this reason, it is unlikely that the court of appeals intended its passing statement—that any late fees would be paid "together" with a late installment payment—to be a binding legal determination that any incurred 10 percent late fees must be paid to bring the Note current.[33] This inference is strengthened by the fact that the court of appeals did not include this phrase when summarizing the court's legal determinations in the opinion's conclusion section.[34] Accordingly, we hold that the court of appeals did not make a legal determination regarding whether the 10 percent late fee must be paid to bring the Note current, so the district court did not violate the mandate rule when it decided this issue.

---

[32] *See Madsen v. Wash. Mut. Bank FSB*, 2008 UT 69, ¶ 26, 199 P.3d 898 ("[W]e frequently decline to rule on an issue when it has not been fully briefed by the parties because full briefing allows this court to carefully consider fully developed and supported arguments."); *cf. Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 19, 218 P.3d 583 (explaining that the court "would have refused to review such an unripe or moot issue because [the] decision would have amounted to nothing more than an advisory opinion"); *State v. Ortiz*, 1999 UT 84, ¶ 3, 987 P.2d 39 ("This court will not issue advisory opinions or examine a controversy that has not yet 'sharpened into an actual or imminent clash of legal rights and obligations between the parties thereto.'" (citation omitted)).

[33] Judge Connors disagrees with this assertion. In his dissenting opinion, he states that the court of appeals made a clear legal determination regarding the due date of the late fee provision. *Infra* ¶ 174 (Connors, J., dissenting in part). But he also concedes that it may not have been appropriate for the court of appeals to have done so. *Id.* For the reasons already stated in this section, we disagree with Judge Connors' conclusion.

[34] *Brady*, 2013 UT App 97, ¶ 58.

*B. The district court correctly concluded that the Note is
ambiguous regarding what is required to bring the note
current under the 20 percent default interest provision, but
it erred by failing to consider extrinsic evidence before
construing the ambiguity against the Park Defendants*

¶52 The Park Defendants also argue that even if the district court did not violate the mandate rule by determining this issue, it nevertheless erred by interpreting the Note incorrectly. The court determined that the Note was ambiguous regarding what was required to bring the Note current. Rather than attempting to resolve this ambiguity by considering extrinsic evidence, it decided the issue by construing the ambiguity against the Park Defendants as the drafters of the provision. As a result, it concluded that the Note did not require the 10 percent late fee to be paid to stop the accrual of interest at the 20 percent default rate. We agree that the Note is ambiguous, but we reverse the district court's decision and remand for further factual findings because the district court failed to adequately consider extrinsic evidence before construing the Note against the Park Defendants.

¶53 When we interpret a contract "we first look at the plain language [of the contract] to determine the parties' meaning and intent."[35] "If the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language, and the contract may be interpreted as a matter of law."[36] But where a contractual term or provision is ambiguous as to what the parties intended, the question becomes a question of fact to be determined by the fact-finder.[37] So

---

[35] *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671, *abrogated on other grounds by Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony at White Pine Canyon*, 2018 UT 23, 422 P.3d 809.

[36] *Cent. Fla. Invs., Inc. v. Parkwest Assocs.*, 2002 UT 3, ¶ 12, 40 P.3d 599.

[37] *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury. Failure to resolve an ambiguity by determining the parties' intent from parol evidence is error." (citation omitted)); *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983) ("Of course, a motion for summary
(Continued)

where parties to a contract dispute propose competing interpretations of a contractual term or provision, we must determine whether the contract as a whole unambiguously supports one interpretation over the other. If "uncertain meanings of terms, missing terms, or other facial deficiencies" prevent the court from determining which of the "proffered alternative interpretations" the parties intended when they entered into the contract, then the court deems the contractual provision at issue ambiguous, and the ambiguity must be resolved by considering extrinsic evidence of the parties' intent.[38]

¶54 In his dissent, Justice Lee argues that we have never clearly explained when a contractual term is sufficiently ambiguous to open the door to extrinsic evidence. But this argument brushes aside sixty years of our caselaw in which we have repeatedly set forth the following standard: where there are two reasonable[39] interpretations of a contractual provision, we look to extrinsic evidence.[40] So a

---

judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended.").

[38] *See Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 (citation omitted) (internal quotation marks omitted).

[39] Judge Connors points out that some of our previous cases have used the term "plausible" rather than "reasonable." *Infra* ¶ 178 n.121 (Connors, J., dissenting in part). In Judge Connor's view, we should disavow any use of the word "plausible" from our caselaw because it suggests a lower standard than the word "reasonable." *Infra* ¶ 178 n.122 (defining plausible as "superficially fair, reasonable" or "seeming reasonable or probable (though speculative)"). But a disavowal of the cases Judge Connors cites is unnecessary because even where we have used the term "plausible" in the past, we have treated it as if it had roughly the same meaning as the term "reasonable." *See Mind & Motion*, 2016 UT 6, ¶ 24 ("[T]he proffered alternative interpretations 'must be plausible and reasonable in light of the language used.'" (citation omitted)); *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 17, 133 P.3d 428 (same); *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998) (same).

[40] *See Ephraim Theatre Co. v. Hawk*, 321 P.2d 221, 223 (Utah 1958) (explaining that a court may look to "extraneous sources" only where the contract "is susceptible of more than one meaning");
(Continued)

contractual term or provision is ambiguous if "it is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies."[41]

¶55 Justice Lee argues, however, that we have never explained "what it means for competing parties both to offer a 'reasonable' interpretation of the contract provision in question."[42] Although it is

---

*Winegar v. Froerer Corp.*, 813 P.2d 104, 108 (Utah 1991) ("A contract provision is ambiguous if it is capable of more than one reasonable interpretation because of 'uncertain meanings of terms, missing terms, or other facial deficiencies.'" (citation omitted)).

[41] *Meadow Valley Contractors,* 2011 UT 35, ¶ 64 (emphasis added) (citation omitted) (internal quotation marks omitted); *see also Cent. Fla. Invs.*, 2002 UT 3, ¶ 12 ("In evaluating whether the plain language is ambiguous, we attempt to harmonize all of the contract's provisions and all of its terms. An ambiguity exists where the language is reasonably capable of being understood in more than one sense." (citations omitted) (internal quotation marks omitted)); *Plateau Mining Co.*, 802 P.2d at 725 ("To demonstrate ambiguity, the contrary positions of the parties must each be tenable."). Justice Lee makes no effort to square his proposed approach with this caselaw. In fact, under his approach any consideration of whether both interpretations are "reasonable" is altogether excluded from the court's analysis. Instead, the court would decide which interpretation it believes is the most "plausible." *Infra* ¶ 136 (Lee, A.C.J., dissenting in part).

[42] *Infra* ¶ 127 (Lee, A.C.J., dissenting in part). Justice Lee argues that we have never before defined the term "reasonable" in the context of a contract interpretation. It is on this basis that he purports to "clarify" "what it means for competing parties to offer a 'reasonable' interpretation of the contract provision in question." But at no point in his dissent does he clarify what a reasonable interpretation would be. Instead, he suggests that even where a court is presented with two reasonable interpretations, neither of which can be ruled out by examining the interpretations in context of the contract as a whole, the court may take it upon itself to decide which interpretation is the better one. Justice Lee does not attempt to justify this significant departure from our longstanding approach to contract interpretation by pointing to precedent. He does not, because he cannot. Although we have frequently explained what it means for a contract interpretation to be reasonable, *see, e.g.*, *Mind &*

(Continued)

true that we have used the term "reasonable" repeatedly for decades without defining the term further—presumably under the assumption that it is a bedrock term whose meaning was obvious—we have provided a consistent explanation for what constitutes a reasonable interpretation sufficient to create an ambiguity. Under our caselaw a reasonable interpretation is an interpretation that cannot be ruled out, after considering the natural meaning of the words in the contract provision in context of the contract as a whole, as one the parties could have reasonably intended.[43] In other words, if the court determines that either of the competing interpretations could reasonably have been what the parties intended when they entered into the contract, then the contract is ambiguous.[44] Where we

---

*Motion*, 2016 UT 6, ¶ 24 (explaining that a contract is ambiguous where there are two "plausible and reasonable" interpretations, the existence of which prevent the court from determining "the parties' intentions"(citation omitted) (internal quotation marks omitted)); *Saleh*, 2006 UT 20, ¶ 17 (explaining that a contract is ambiguous where there are at least two interpretations that rise to "more than a conjecture"); *Cent. Fla. Invs.*, 2002 UT 3, ¶ 12 ("An ambiguity exists where the language is reasonably capable of being understood in more than one sense." (citations omitted) (internal quotation marks omitted)), we have never applied the standard Justice Lee proposes in his dissent.

[43] *See Cent. Fla. Invs.*, 2002 UT 3, ¶ 12 ("An ambiguity exists where the language is reasonably capable of being understood in more than one sense." (citations omitted) (internal quotation marks omitted)); *Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061–62 (Utah 1981) (explaining that a contractual provision is ambiguous only where "an ambiguity . . . cannot be reconciled by an objective and reasonable interpretation of the contract as a whole" after the court has examined "[e]ach contract provision . . . in relation to all of the others"); *see also Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) ("When determining whether a contract is ambiguous, it is important for the court to read the integrated agreement 'as a whole.' If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the [agreement].'" (alteration in original) (citations omitted)).

[44] We have repeatedly stressed that a contractual provision is not rendered ambiguous "just because one party gives that provision a

(Continued)

conclude that either of the contract interpretations could reasonably have been what the parties intended, we will not substitute our judgment for that of the parties by choosing what we believe to be the better of the two interpretations.[45]

---

different meaning than another party does." *See, e.g.*, *R&R Energies v. Mother Earth Indus., Inc.*, 936 P.2d 1068, 1074 (Utah 1997) (citation omitted) (internal quotation marks omitted). Instead, we will conclude that the parties could reasonably have intended both of the competing interpretations only if each interpretation is "based upon the usual and natural meaning of the language used and [is not] the result of a forced or strained construction" when considered in context of the contract as a whole. *Saleh*, 2006 UT 20, ¶ 17 (citation omitted) (internal quotation marks omitted).

[45] *See Plateau Mining Co.*, 802 P.2d at 725 ("Failure to resolve an ambiguity by determining the parties' intent from parol evidence is error."); *id.* (explaining that our approach to contract interpretation "preserves the intent of the parties and protects the contract against judicial revision"). By stating that a contract is ambiguous only where two interpretations "are of equal (or at least roughly equal) plausibility," Justice Lee proposes an approach whereby, for the first time ever, a Utah court could disregard one reasonable interpretation of a contract because the court believes a competing interpretation is preferable (or more plausible). *Infra* ¶ 136 (Lee, A.C.J., dissenting in part). In other words, his approach would expand the contract interpretation analysis by adding an additional step—the weighing of two reasonable interpretations after the court determines that both are objectively reasonable on their own. This is an approach we have criticized in the past. *See Meadow Valley Contractors*, 2011 UT 35, ¶ 69. In *Meadow Valley Contractors*, the district court failed to consider relevant extrinsic evidence after it "cursorily concluded" that one of the interpretations "was 'the more reasonable interpretation'" of the contract. *Id.* Although we criticized the district court for having failed to consider extrinsic evidence where there potentially were two reasonable interpretations of the contract provision at issue, under Justice Lee's proposed approach, the district court's acceptance of "the more reasonable interpretation" would have been proper. Thus his approach departs dramatically from our longstanding approach.

Additionally, Justice Lee's approach suffers from the same deficiency that he claims justifies his "clarification" of our

(Continued)

longstanding approach to contract interpretation. He defines a reasonable interpretation as the more "plausible" of two competing interpretations. But he fails to define the term "plausible." Instead, he treats it as a bedrock term needing no further definition. Under his approach, if one interpretation is more "plausible" than the other, it is deemed a reasonable interpretation and the other interpretation is deemed unreasonable. So "more plausible" now means "reasonable" and "less plausible" now means "unreasonable," even though the less plausible interpretation may be reasonable under any ordinary definition of the word. This approach strains the ordinary meaning of "reasonable" beyond recognition. It is an altogether new invention. Moreover, because he does not define the term "plausible," it is left to the district court's judgment, based on the commonly-accepted meaning of the term, to decide whether one interpretation is more plausible than the other. So Justice Lee's approach does not provide district courts a more clear or transparent standard than what is provided by our longstanding approach. The only difference, therefore, between the two approaches is that under Justice Lee's approach, district courts would have new discretion to disregard one reasonable interpretation if they believe it is less reasonable or plausible than another. This is a dramatic departure from the way in which we have long addressed ambiguities in contracts. While this approach may or may not be a good idea, this is not the case to make so monumental a change—the parties have not asked that we revise our standard for interpreting ambiguous contractual provisions, nor have they provided briefing on the issue.

In support of this change, Justice Lee argues that parties generally prefer quick and inexpensive resolutions of their disputes. *Infra* ¶ 131 (Lee, A.C.J., dissenting in part). In support of his assertion, he relies upon a Yale Law Review article that is addressed specifically to contract disputes between sophisticated business entities who tend to be frequent participants in litigation. Alan Schwartz & Robert E. Scott, *Contract Interpretation Redux*, 119 YALE L.J. 926, 935 (2010) (explaining that the "interpretive rules" they propose are reflective of "the preferences of business firms that contract with each other"). The idea of the article seems to be that for these sophisticated frequent fliers, it will all wash out in the end—they are likely to win as many as they lose under a standard that more narrowly circumscribes extrinsic evidence. *Id.* at 931 (explaining that "a risk neutral firm is indifferent to the magnitude of the variance around the mean" so it is "unwilling to incur additional costs in order to

(Continued)

¶56 So where a contractual term is genuinely ambiguous, "we seek to resolve the ambiguity by looking to extrinsic evidence of the parties' intent."[46] A determination of the parties' intent based on extrinsic evidence is a factual determination that should be made by the fact-finder.[47] In the rare case where the extrinsic evidence "does not reveal the intent of the parties,"[48] a district court should then, and only then, "resolve the ambiguity against the drafter."[49]

¶57 The first step of this analysis—deciding whether the contractual term is ambiguous—is a legal determination that we review for correctness, but the district court's findings regarding the extrinsic evidence are factual determinations that deserve

---

further increase the accuracy of any particular finding"). So, according to the authors of the article, efficiency and cost are more important considerations for sophisticated business parties than an accurate resolution of the dispute. *Id.* at 934 ("We argue that the contract law that regulates transactions between firms should seek only to maximize efficiency."). While it is certainly true that parties prefer quick and inexpensive resolutions of their disputes, it is not necessarily true in every case that parties would prefer a quick and inexpensive resolution over an accurate result—especially in cases involving parties who do not litigate frequently. This suggests that Justice Lee's proposed approach may not be appropriate in every case. Regardless, as noted, even were Justice Lee's proposed change to our caselaw a wise tack to take, this hardly seems the case for it given the absence of any request to change our standard and the absence of any adversarial briefing on the question.

[46] *Meadow Valley Contractors*, 2011 UT 35, ¶ 64; *see also Faulkner*, 665 P.2d at 1293 ("[A] motion for summary judgment may not be granted if a legal conclusion is reached that an ambiguity exists in the contract and there is a factual issue as to what the parties intended."); *Evans v. Famous Music Corp.*, 807 N.E.2d 869, 873 (N.Y. 2004) ("Faced with this ambiguity, we turn to extrinsic evidence for guidance as to which interpretation should prevail.").

[47] *See Plateau Mining Co.*, 802 P.2d at 725 ("When ambiguity does exist, the intent of the parties is a question of fact to be determined by the jury. Failure to resolve an ambiguity by determining the parties' intent from parol evidence is error." (citation omitted)).

[48] *Meadow Valley Contractors,* 2011 UT 35, ¶ 69.

[49] *Id.* ¶ 64.

deference.[50] Accordingly, if the district court's decision hinges upon extrinsic evidence, it should be overturned only if it was clearly erroneous.[51]

¶58 Although the district court in this case was correct in holding that the Note is ambiguous regarding what must be paid to bring the Note current, we hold that the court erred by deciding the issue by construing the ambiguity against the Park Defendants without first considering relevant extrinsic evidence.

1. The note's plain language

¶59 First, we address the district court's determination that the Note is ambiguous regarding what is required to bring the Note current under the 20 percent default interest provision. The Park Defendants argue that any potential ambiguity in the 20 percent default interest provision should be resolved in their favor when considered together with their proposed interpretation of a phrase within the Note's 10 percent late fee provision. We hold that the language of the 20 percent default interest provision is ambiguous even if we interpret the 10 percent late fee provision as the Park Defendants suggest.[52]

---

[50] *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 40, 308 P.3d 382.

[51] *See id.*

[52] The Park Defendants argue that a 10 percent late fee, which is imposed by the Note's 10 percent late fee provision, must be paid before the Note "is brought current." The 10 percent late fee provision states that "[i]f a payment is not made within five (5) days of due date, a late fee of 10 per cent will be due." They argue that based on the plain meaning of the term "will be due," the 10 percent late fee becomes due immediately when it is incurred, so the Note cannot be "brought current" until the 10 percent late fee is paid. They further support this argument with language from two trust deeds incorporated into the Note—which refer to the 10 percent late fee as a fee "to cover the extra expense involved in handling delinquent payments." So they assert that the 10 percent late fee must be paid with the late payment because it served "as a proxy for the expenses incurred by Park in handling late payments."

The Bradys, on the other hand, interpret the term "will be due" to mean that it will be due sometime in the future. They argue that if the parties had intended the late fees to be due immediately, they

(Continued)

¶60   The 20 percent default interest provision states: "If payment is not made within 5 days of due date the entire balance shall bear interest at a rate of 20 percent until note is brought current." So under this provision interest accrues on "the entire balance" at 20 percent until the Note "is brought current." Although the Park Defendants assume that any and all outstanding debts owed under the Note must be paid to bring the Note current, this assumption is not expressly supported by anything in the Note. The phrase "brought current" is not defined elsewhere in the Note and is not used in connection with a payment type other than the monthly installment payment. So even though it is reasonable to interpret the phrase—as the Park Defendants suggest—to require that the Bradys pay all late installment payments and late fees in order to bring the Note current, we find that it is also reasonable to read the Note to allow the Bradys to bring it current by paying only late, or missing, installment payments.

---

would have stated that the fee "is due" rather than "will be due." They suggest that this interpretation is required when the phrase is considered in the context of the Note as a whole because another provision in the Note—which allows the Park Defendants to accelerate the Note in the event of a default—refers to amounts immediately due as "due and payable." *See Due and Payable*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("(Of a debt) owed and subject to immediate collection because a specified date has arrived or time has elapsed, or some other condition for collectibility has been met."). They also support this interpretation by pointing to language in the incorporated trust deeds. Because certain provisions in the trust deeds indicate that obligations shall be paid "immediately," but the 10 percent late fee provision does not, they claim that additional language would have been added to the 10 percent late fee provision if the parties had intended the late fees to be due immediately. Because neither "due and payable" nor "immediately" were used in the 10 percent late fee provision, they argue that the Note did not require the 10 percent late fee to be paid immediately.

Although these dueling interpretations of the 10 percent late fee provision suggest that the phrase "will be due" may be ambiguous, we do not decide this issue on this basis because we conclude that the language of the 20 percent default interest rate provision is ambiguous in its own right.

¶61 The latter interpretation is suggested by the structure of the Note. The structure contemplates three categories of payments: (1) monthly installment payments, (2) a final balloon payment, and (3) a 10 percent late fee for every late installment payment. Under the terms of the Note, a monthly installment payment of $5,923.61 is due "on the [first] day of each and every month" for ten years. The "entire principal balance together with interest thereon" (final balloon payment) is due on October 31, 2006. And the 10 percent late fees are potentially due either immediately when incurred or together with the final balloon payment.

¶62 Importantly, of these three types of payments, it is only the monthly installment payment that is specifically tied to the 20 percent default interest provision. The Note specifies that the 20 percent default interest will begin accruing on "the entire balance"[53] if the "[installment] payment is not made within 5 days of due date."[54] So it is only the failure to timely pay installment payments—and not a failure to pay the other two types of payments contemplated in the Note—that triggers the 20 percent default interest. In this way, the Note specifically ties the installment payments to the 20 percent default interest provision, something it does not do for the other types of payments. Because the monthly installment payment is the only type of payment contemplated in the default interest provision, it is reasonable to conclude that the phrase "brought current" within the provision refers only to the payment of late installment payments.

---

[53] In *Brady*, the court of appeals held that the phrase "the entire balance" in the 20 percent default interest provision refers only to the "entire principal balance." 2013 UT App 97, ¶ 20 (internal quotation marks omitted). In other words, the failure to timely pay an installment payment triggers the accrual of interest at a 20 percent rate on unpaid principal amounts, but not on other amounts owed under other provisions in the Note, including unpaid accrued interest or unpaid 10 percent late fees.

[54] Although the term "payment" could be viewed in isolation as including both the installment payment and the final balloon payment, when the term is considered in context of the Note as a whole, it is clearly referring only to monthly installment payments. *See infra* section II of this opinion regarding our discussion of the 10 percent late fee as applied to the final balloon payment.

¶63 In sum, the phrase "brought current" has two reasonable interpretations. The Note could, as the Park Defendants argue, require the payment of the missed installment payments as well as a payment of any 10 percent late fees that are currently due to bring the Note current. But it could just as reasonably require only the payment of the missed installment payments. Because the phrase "brought current" is not defined in the Note—and this omission leads to two contradictory but reasonable interpretations—we conclude that the Note is ambiguous.[55]

2. Extrinsic evidence

¶64 Because the 20 percent default interest provision is ambiguous, our well-established pattern of contract interpretation would ordinarily require us to consider the district court's factual findings regarding relevant extrinsic evidence.[56] But that is not possible in this case because the district court failed to make the necessary factual findings. Rather than looking to the extrinsic evidence to resolve the ambiguity, the court instead skipped to construing the provision against the Park Defendants as the drafters. This was error.

¶65 By failing to consider extrinsic evidence before construing the ambiguous provision against the Park Defendants, the district court did what we expressly refused to do in *Meadow Valley*

---

[55] Under the standard Justice Lee sets forth in his dissent, we would be forced to choose between these two reasonable interpretations. In Justice Lee's view, the Park Defendants present the "better interpretation," so he would rule in their favor on this issue. But we are not convinced. Even were we to adopt Justice Lee's proposed approach in this case, we might very well rule in the Bradys' favor. This disagreement further strengthens our conclusion that the contractual provision at issue is ambiguous.

Judge Connors, in contrast, proposes a third approach. In his dissent, he declines to endorse Justice Lee's change to our contract-interpretation standard, but he argues that under our current approach, the contract is unambiguous because the Bradys' interpretation is not reasonable. Because we conclude that the Bradys' interpretation is reasonable when considered in context of the Note as a whole, we disagree.

[56] *Meadow Valley Contractors,* 2011 UT 35, ¶ 64.

*Contractors*.[57] In that case the appellant asked us to resolve an ambiguity in a construction contract against the appellee who drafted the contract. We noted that by suggesting this, the appellant was ignoring "a critical analytical step."[58] We then explained the proper methodology a court should follow after concluding that the text of a contract is ambiguous: "when a trial court concludes that contractual language is ambiguous, the court will invite extrinsic evidence bearing on the intentions of the parties to the contract concerning the ambiguity. The court would then assess the merits of the extrinsic evidence and reach a conclusion about the intentions of the parties."[59] We finished by stating that "[o]*nly if* the court concludes that the extrinsic evidence does not reveal the intent of the parties and uncertainty remains will the court construe the ambiguity against the drafter."[60] In this case, the district court failed to assess the merits of the extrinsic evidence before construing the ambiguity in the default interest provision against the Park Defendants as the drafters. For this reason, we reverse the district court's decision and remand for a determination that considers the relevant extrinsic evidence.

## II. We Affirm the District Court's Determination Regarding the 10 Percent Late Fee's Application to the Balloon Payment

¶66 Next, we consider the Park Defendants' challenge of the district court's interpretation of the Note's 10 percent late fee provision as it relates to the final balloon payment. The district court concluded that, under the plain language of the Note, the 10 percent late fees did not apply to the final balloon payment. Additionally, the court held that extrinsic evidence, in the form of a memorandum of understanding drafted by the parties, supported this interpretation. And, alternatively, the court held that even if the 10 percent late fee provision did apply to the final balloon payment, it would be unconscionable and thus unenforceable. The Park Defendants challenge each of these determinations. We hold that the district court's interpretation of the language of the 10 percent late fee provision is reasonable. Therefore a determination that the Park

---

[57] *Id.* ¶ 69.

[58] *Id.*

[59] *Id.* (footnote omitted).

[60] *Id.*

Defendants' alternative interpretation is also reasonable would merely render the Note ambiguous. And because we find that the district court's determination regarding extrinsic evidence was not clearly erroneous, we affirm its determination on this basis.[61] This holding moots the Park Defendants' unconscionability challenge, so we decline to address it. As we did with the district court's interpretation of the 20 percent default interest provision, we first examine the contract's plain language. And because the Park Defendants' alternative interpretation could render the contract ambiguous, we also consider the district court's findings regarding the extrinsic evidence.[62]

### A. Plain meaning of the Note

¶67 We begin by interpreting the text of the 10 percent late fee provision. The district court concluded that the provision unambiguously did not apply the 10 percent late fee to the final payment. The court considered the Note's relevant text, which states that Dr. Park would be paid $675,000:

> [T]ogether with interest from date at the rate of 10 per cent per annum on the unpaid principal, said principal and interest payable as follows:
>
> > $5,923.61 due in [sic] the 1st day of January 1997, and $5,923.61 on the 1st day of each and every

---

[61] We note that to have prevailed on this issue, the Park Defendants would have had to show (1) that their interpretation of the Note was reasonable, and the district court's interpretation was unreasonable, *see Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("To demonstrate ambiguity, the contrary positions of the parties must each be tenable."), or (2) that their interpretation was reasonable, and the district court's factual findings regarding extrinsic evidence were clearly erroneous. *See R & R Energies v. Mother Earth Indus., Inc.*, 936 P.2d 1068, 1074 (Utah 1997) ("This court will not disturb the trial court's factual finding . . . unless it is clearly erroneous."). Because the Park Defendants fail to show that the district court's interpretation was unreasonable or that its factual findings were clearly erroneous, we must affirm the district court's determination.

[62] *See supra* ¶¶ 53–55 (explaining our approach to contract interpretation).

> month thereafter until October 31, 2006, at which time the entire principal balance together with interest thereon is paid in full.
>
> Interest shall accrue from December 1, 1996.
>
> The payment is based on a 30 year amortization.
>
> Each payment shall be applied first to accrued interest and the balance to the reduction of principal. If a payment is not made within five (5) days of due date, a late fee of 10 per cent will be due. If payment is not made within 5 days of due date the entire balance shall bear interest at the rate of 20% until note is brought current.

The district court noted that this provision differentiates between the $5,923.61 installment payments made "every month" from the "entire principal balance" balloon payoff, which is due on October 31, 2006. The court also noted that this distinction carries through to the 10 percent late fee provision. For example, the 10 percent late fee provision applies only if "payment" is not made within the five-day grace period and nothing in the provision suggests that the 10 percent late fee also applies if the "entire principal balance" payoff is not timely made. Thus, according to the district court, the Note clearly contemplates two types of payments—the installment payments and the balloon payment—and the 10 percent late fee provision applies only to the installment payments.[63] This interpretation is reasonable, especially when the entire Note is viewed in context.

¶68 That "payment" refers only to the Note's monthly installment payments is suggested by language in the Note's amortization provision. After specifying that an installment payment in the amount of $5,923.61 is due each month, the Note states that the "payment is based on a 30 year amortization." Amortization is defined as "[t]he act or result of gradually extinguishing a debt . . . by contributing payments of principal each time a periodic interest payment is due."[64] So when the Note states that the "payment is

---

[63] As we discussed above, the Note also contemplates a third type of payment: the 10 percent late fee payment. *See supra* ¶¶ 61–63.

[64] *Amortization*, BLACK'S LAW DICTIONARY (10th ed. 2014); *see also amortize*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 39 (10th ed.

(Continued)

based on a 30 year amortization," it means that the $5,923.61 monthly installment payment amount was determined by calculating how much the Bradys would need to pay each month for a period of thirty years in order to pay off the Note's $675,000 principal while incurring interest at a 10 percent rate. Because no other type of payment contemplated in the Note could be "based on a 30 year amortization," it is reasonable to conclude that the term "payment" in the amortization provision refers to the monthly installment payment.

¶69 The meaning of the term "payment" in the amortization provision is consistent with its meaning throughout the rest of the Note. For example, the first sentence of the Note's next paragraph states that "[e]ach payment shall be applied first to accrued interest and the balance to the reduction of principal." Once again, the term "payment"—as it is used here—could only reasonably refer to the monthly installment payment, and not the other two types of payments contemplated by the Note. It couldn't reasonably refer to the 10 percent late fee payment, because that payment would necessarily be applied to amounts owed for late fees. And it couldn't reasonably refer to the final balloon payment, because the final balloon payment, by its very nature, must be in the amount of the total remaining balance (principal plus interest), so it would not matter in which order it is applied. So once again the only payment type the term "payment" could reasonably refer to in this provision is the monthly installment payment.

¶70 Because it is reasonable to conclude that "payment," as it is used throughout the Note, refers only to the monthly installment payment, it arguably maintains this meaning when it is used in the 10 percent late fee provision.[65] It is reasonable, therefore, to conclude that the 10 percent late fee provision applies only to the monthly installment payments—and not to the final balloon payment.

---

1998) ("[T]o provide for the gradual extinguishment of [a debt] usu. by contribution to a sinking fund at the time of each periodic interest payment.").

[65] *See Irving Place Assocs. v. 628 Park Ave., LLC*, 2015 UT 91, ¶¶ 20–21, 362 P.3d 1241 (employing the canon of consistent meaning to determine the meaning of a term); *see also Meeker v. Mahon*, 143 A.3d 1193, 1198–99 (Conn. App. Ct. 2016) ("We read similar or identical terms and words throughout a contract to have a consistent meaning.").

¶71 The Park Defendants interpret the 10 percent late fee provision, however, as applying to the final balloon payment. They state that the term "payment," as it is used throughout the Note, plainly refers to all payments due under the Note, including the final payment on October 31, 2006. So according to them, the use of the term "payment" in the late fee provision should be read to include the balloon payment. But we need not address the merits of the Park Defendants' alternative interpretation, because even if we found it to be reasonable, it would merely render the 10 percent late fee provision ambiguous, thereby requiring us to consider the district court's factual determination regarding extrinsic evidence. And because we conclude that the court did not clearly err when it determined that the extrinsic evidence shows that the parties did not intend the 10 percent late fee to apply to the final balloon payment, we must affirm the district court's decision even if the Park Defendants' alternative interpretation is reasonable.

*B. Extrinsic evidence*

¶72 The district court's factual determination regarding the 10 percent late fee provision's application to the final payment was not clearly erroneous. When reviewing a factual determination under a clearly erroneous standard, an "appellate court . . . does not consider and weigh the evidence de novo."[66] Accordingly, "[t]he mere fact that on the same evidence the appellate court might have reached a different result does not justify it in setting the findings aside."[67] Instead, "[i]t may regard a finding as clearly erroneous only if the finding is without adequate evidentiary support or induced by an erroneous view of the law."[68] In this case, the district court considered the parties' handwritten memorandum of understanding before finding that the parties intended the 10 percent late fee provision to apply only to the monthly installment payments. This determination is adequately supported by relevant extrinsic evidence.

---

[66] *State v. Walker*, 743 P.2d 191, 193 (Utah 1987) (alteration in original) (quoting CHARLES ALAN WRIGHT & ARTHUR R. MILLER, *FEDERAL PRACTICE AND PROCEDURE* § 2585 (1971)).

[67] *Id.* (citation omitted) (internal quotation marks omitted).

[68] *Id.* (citation omitted) (internal quotation marks omitted).

¶73 In the memorandum of understanding, the parties wrote that "the payment will be made via monthly installments due on [the] First of each month with 10% late fee after five days." The district court concluded that "nothing in that provision addressed the balloon payment." Rather, "the parties defined 'payment' as 'monthly installments' made 'each month' and further provided that the 10% late fee applied only if those 'monthly installments' were more than five days late." Under this definition, the 10 percent late fee would apply to every installment payment from January 1, 1997 to October 1, 2006, but not to the final balloon payment due on October 31, 2006. We cannot say the district court clearly erred in making this determination.

¶74 The Park Defendants argue, however, that the memorandum of understanding shows that the 10 percent late fee should apply to the final balloon payment, as well as the monthly installment payments, because it treats all payments the same. In support, they assert that the memorandum of understanding "does not contain any separate definition of the final 'balloon payment,' nor does it set forth a different due date for that payment." But this argument fails because, as the district court pointed out, the Note treats the monthly installment and the final balloon payment differently, and it discusses the 10 percent late fee only in connection with the monthly installment payment.

¶75  Most noticeably, the Note treats the payments differently by establishing a different due date for the two payment types: each monthly installment is due on the first day of each month, but the due date for the final balloon payment is specifically set for October 31, 2006.

¶76 And as we have already noted, the memorandum of understanding treats the final balloon payment differently from the monthly installment payment by specifically establishing the 10 percent late fee for "monthly installment[]" payments without any reference to the final balloon payment. The Park Defendants argue that the term "monthly installments" includes the final balloon payment. But even if we agree that the term could be interpreted in this way, their argument would still fail because they have not shown that the district court's conclusions are unsupported by the language of the memorandum of understanding.[69] Accordingly, the

---

[69] *See supra* ¶¶ 72–73.

Park Defendants have failed to show that the extrinsic evidence does not adequately support the district court's factual determination, so we cannot say the court's determination was clearly erroneous.

¶77 For this reason, we affirm the district court's determination that the 10 percent late fee provision does not apply to the final balloon payment. Because this determination renders a review of the district court's unconscionability determination unnecessary, we decline to address it.

### III. The District Court Violated the Mandate Rule by Recalculating the Dates of the Bradys' Installment Payments

¶78 The Park Defendants argue that the district court violated the mandate rule when it accepted an accounting determination that used payment dates that differed from the payment dates established pre-appeal. As we stated earlier,[70] under the mandate rule when a "case has been appealed and remanded,"[71] "pronouncements of an appellate court on legal issues"[72] and "prior decision[s] of a district court [that were not disturbed on appeal] become[] mandatory" upon the district court on remand.[73] So in this case, the district court's recalculation of the payment dates would violate the mandate rule only if the payment dates had been decided by the pre-appeal district court and survived appellate review. We hold that they did.

¶79 The district court made two pre-appeal determinations related to the payment dates: a legal determination interpreting the meaning of the term "payment date" and a factual determination accepting the actual payment dates established by a neutral, third-party accountant.

¶80 The district court first made its legal determination in its September 3, 2009 decision following the bench trial. The court explained that "a payment should be credited on the date plaintiffs' check was actually received by Mr. Park." But the court also noted

---

[70] *See supra* ¶¶ 44–46.

[71] *Mid-America Pipeline Co.* v. *Four-Four, Inc.*, 2009 UT 43, ¶ 13, 216 P.3d 352.

[72] *Thurston v. Box Elder Cty.*, 892 P.2d 1034, 1037 (Utah 1995).

[73] *IHC Health Servs., Inc. v. D&K Mgmt., Inc.*, 2008 UT 73, ¶ 28, 196 P.3d 588.

that a smaller collection of checks had been accumulated and deposited in the bank as a group. For these accumulated checks, the court explained that "there is no persuasive evidence of a tardy payment, unless the date on the face of the check is beyond the agreed due date."

¶81 At the court's direction, the parties stipulated to the appointment of Rick Hoffman to serve as a neutral, third-party accountant who would calculate the amount owing on the Note. Mr. Hoffman determined the date of each payment and applied the applicable interest rates to arrive at a final payment amount. He then submitted his expert damage calculation on August 5, 2010.

¶82 On February 2, 2011, the district court issued its findings of fact and conclusions of law, in which it reiterated its prior legal determination interpreting the meaning of the term "payment date." At paragraph eighteen, the court discussed the payments as a whole: "Payments made by Plaintiffs under the Notes occurred on the date Park actually received the payment, and not on the date Plaintiffs mailed the payment or wrote a check for the payment." And at paragraph twenty-one, the district court discussed the smaller group of accumulated checks: "Park accumulated a series of Plaintiffs' payment checks and subsequently presented the series as a group for payment at the bank. Under these circumstances, these payments are considered received by Park when they were sent by Plaintiffs." So the district court reaffirmed its previous legal determination of the meaning of the term "payment date."

¶83 In the same February 2, 2011 decision, the district court also made a factual determination regarding the actual dates of payment by accepting Mr. Hoffman's accounting: "[The sum due and owing under the Note] was determined in accordance with the Court's direction and the Parties' stipulation in selecting Mr. Rick Hoffman to perform this calculation."[74] By expressly recognizing that Mr. Hoffman performed his calculation "in accordance with the [district] [c]ourt's direction," the district court made a factual

---

[74] *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 40, 308 P.3d 382 (explaining that factual findings "entail[] the empirical, such as things, events, actions, or conditions happening, existing, or taking place, as well as the subjective, such as state of mind" (alteration in original) (citation omitted) (internal quotation marks omitted)).

determination that Mr. Hoffman's factual findings—including the payment dates—were correct.

¶84 Because the district court incorporated its legal and factual determinations regarding the payment dates into its final, pre-appeal order, those determinations became binding on the district court upon remand as long as the court of appeals did not overturn them. It did not.

¶85 The court of appeals did not have an opportunity to address the legal or factual determinations regarding the payment dates, because neither party appealed them. Although the Bradys now argue they did challenge the district court's "original accounting" during the first appeal, the record clearly shows that the only parts of the accounting they challenged were the district court's legal conclusions that the Note called for compound interest, that the accrued 20 percent default interest had to be paid to bring the Note current, and that the 20 percent default interest provision was conscionable.[75] Thus the district court's legal and factual payment date determinations proceeded unchallenged to the court of appeals.

¶86 Yet the Bradys argue that the court of appeals overturned the district court's pre-appeal payment date determinations.[76] They

---

[75] Although the Bradys do point out in a footnote of their brief in the first appeal that the district court's findings of fact and conclusions of law "do not address how many of the monthly payments were past due," they did not challenge Mr. Hoffman's payment dates or the district court's legal interpretation of the term "payment date." These payment dates were relevant to Mr. Hoffman's calculations—despite the fact that the district court had ruled that the 10 percent late payment fee provision was unconscionable—because the payment dates affected the amount of interest that was continually accruing. For this reason, the Bradys should have brought any challenge of the payment dates on the first appeal if they believed the dates were clearly erroneous.

[76] The Bradys also argue that the Park Defendants failed to preserve this issue and invited the district court's error because the Park Defendants resubmitted evidence of the correct payment dates and requested that the district court "look at the evidence in the record and make specific findings as to which payments are untimely." But this argument fails because the Park Defendants urged the district court to accept their proposed accounting—which

(Continued)

base this argument on language in the court of appeals' opinion in which it instructs the district court to determine "which installment payments generated a late fee." But this comment cannot be interpreted as the Bradys suggest, because the court of appeals is unlikely to have ruled on issues that were not raised and briefed,[77] and the court failed to conduct the necessary "clearly erroneous" review of the pre-appeal district court's factual payment date determinations.[78] Rather than reading the court of appeals' instruction to determine "which installment payments generated a late fee" as an implicit rejection of the pre-appeal district court's legal and factual payment date determinations, we read it as merely an instruction to determine which of the already established payment dates fell beyond the due date. Accordingly, we find that the pre-appeal district court's legal and factual findings regarding the payment dates were not disturbed by the court of appeals.

¶87 Consequently, the district court on remand was bound by the pre-appeal payment dates. In fact, the court even acknowledged this in its May 7, 2015 Memorandum Decision, when it stated that "[t]his [payment date] ruling was not challenged on appeal and thus this issue has been decided and will remain the law applicable in this

---

used the same payment dates as were used in Mr. Hoffman's accounting—because it was "consistent with the previous undisturbed findings in this case," whereas the accounting submitted by the Bradys' accountant contained "a number of errors inconsistent with the record." Because the Park Defendants argued this and the district court ruled to disregard the Park Defendants' proposed accounting, the Bradys' preservation and invited error arguments fail.

[77] *See Madsen v. Wash. Mut. Bank FSB*, 2008 UT 69, ¶ 26, 199 P.3d 898 ("[W]e frequently decline to rule on an issue when it has not been fully briefed by the parties because full briefing allows this court to carefully consider fully developed and supported arguments."); *Helper State Bank v. Crus*, 81 P.2d 359, 362 (Utah 1938) ("On appeal, all questions to be determined must be raised by assignments of error, and in the appellate court only questions so raised can be presented and determined." (citation omitted) (internal quotation marks omitted)).

[78] An appellate court may overturn a district court's factual determination only if it decides that the factual determination was "clearly erroneous." *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 40.

case." But the court later contradicted this statement when it misinterpreted its pre-appeal legal determination and completely disregarded its factual one.[79]

¶88 In both its May 7, 2015 and October 29, 2015 memoranda decisions, the district court quoted language from its pre-appeal, September 3, 2009 decision, in which it stated that "there [was] no persuasive evidence of a tardy payment, unless the date on the face of the check is beyond the agreed due date." But the court apparently failed to realize that it had made this statement while referring to the payment dates for a smaller group of accumulated checks that had been deposited as a group, and not to the payment dates as a whole. This was error. The language in the pre-appeal, February 2, 2011 findings of fact and conclusions of law makes it clear that the majority of payments "occurred on the date Park actually received the payment, and not on the date Plaintiffs mailed the payment or wrote a check for the payment." By overlooking the context in which it stated that "the date on the face of the check" constitutes the payment date, the court incorrectly concluded that the accounting submitted by the Bradys best conformed to its pre-appeal ruling.[80]

¶89 The court also overlooked its pre-appeal factual determination regarding the payment dates. Despite the fact that it had recognized that Mr. Hoffman's accounting—including the payment dates—conformed to its directions before the appeal, on remand the court accepted an accounting that utilized different dates.[81] This too was error.

_____

[79] We note that during the first round of litigation at the district court this case was presided over by the Honorable Joseph C. Fratto, but on remand it was presided over by the Honorable Robert P. Faust. Accordingly, on remand Judge Faust was interpreting the previous memoranda decisions issued by Judge Fratto.

[80] It appears that the Bradys' accountant simply used the dates on the face of the checks as the payment date for all installment payments—a method the district court's pre-appeal decision prohibited.

[81] In contrast to the accounting submitted by the Bradys' accountant, the accounting submitted by the Park Defendants' accountant used the same dates as Mr. Hoffman.

¶90 Because the district court's pre-appeal legal and factual determinations regarding the payment dates became the law of the case, the court on remand was bound by them. For this reason, the court's decision to accept different payment dates violated the mandate rule.

### IV. The District Court Erred When it Awarded Pre- and Postjudgment Interest to the Bradys at a 10 Percent Rate

¶91 The Park Defendants next argue that the district court erred when it awarded 10 percent pre- and postjudgment interest to the Bradys. We agree.

*A. The district court erred when it awarded prejudgment interest at a 10 percent rate under Utah Code section 15-1-1*

¶92 As part of its October 29, 2015 memorandum decision, the district court awarded prejudgment interest to the Bradys at a rate of 10 percent pursuant to Utah Code section 15-1-1. The Park Defendants challenged this in their motion to alter or amend the final judgment,[82] but the district court denied the motion because it held that section 15-1-1 applies to any "chose in action"[83] and the Bradys' claim was indisputably a chose in action. The Park Defendants now challenge this legal conclusion.

¶93 The Park Defendants cite our decision in *USA Power, LLC v. PacifiCorp*,[84] to argue that section 15-1-1 is limited to "only those contracts . . . for the 'loan . . . of any money [or] goods' or for the 'forbearance of any . . . chose in action.'"

¶94 The Bradys argue, however, that the district court's prejudgment interest award was correct because the Note

---

[82] The motion was made pursuant to rule 59 of the Utah Rules of Civil Procedure.

[83] *Chose in action*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("1. A proprietary right in personam, such as a debt owed by another person, a share in a joint-stock company, or a claim for damages in tort. 2. The right to bring an action to recover a debt, money, or thing. 3. Personal property that one person owns but another person possesses, the owner being able to regain possession through a lawsuit.").

[84] 2016 UT 20, ¶ 108, 372 P.3d 629 (second, third, and fourth alterations in the original) (quoting UTAH CODE § 15-1-1).

constituted a contract for a loan and, under *USA Power,* section 15-1-1 still applies to any "lawful contract" for a loan. But this argument fails because the judgment awarded to the Bradys was not for money owed under a loan contract—it was for money owed due to an overpayment of money owed under a loan contract. This distinction is significant, and consequently we hold that the district court erred by concluding that section 15-1-1 applied to the Bradys' judgment.

¶95 Before our decision in *USA Power*, we had suggested—in dicta or without analyzing "the potentially limiting 'loan or forbearance' language in the statute"—that section 15-1-1 applies "to all cases involving a contract."[85] Consequently, before our decision in *USA Power*, many courts interpreted section 15-1-1 as setting "a default interest rate" for most contracts.[86] And, more importantly for our present discussion, courts also routinely applied the default 10 percent interest rate to overpayments made in connection with contracts.[87] Although *USA Power* clarified that section 15-1-1 applied

---

[85] *Id.* ¶ 107 (discussing previous cases where we suggested that section 15-1-1 applied to any contract).

[86] *Consolidation Coal Co. v. Utah Div. of State Lands & Forestry*, 886 P.2d 514, 524 n.13 (Utah 1994), *abrogated on other grounds by State ex rel. Sch. & Institutional Tr. Land Admin. v. Mathis*, 2009 UT 85, 223 P.3d 1119; s*ee also, e.g., Highlands at Jordanelle, LLC v. Wasatch Cty.*, 2015 UT App 173, ¶ 30, 355 P.3d 1047; *Whitney v. Faulkner*, 2004 UT 52, ¶ 17, 95 P.3d 270 (limiting section 15-1-1 to the contract setting—not only to contracts for loans or forbearance), *abrogated by USA Power, LLC v. PacifiCorp*, 2016 UT 20, 372 P.3d 629; *Francis v. Nat'l DME*, 2015 UT App 119, ¶ 44, 350 P.3d 615 (concluding that section 15-1-1 applies to all contracts).

[87] *See, e.g., Highlands at Jordanelle*, 2015 UT App 173, ¶¶ 30–32 (applying section 15-1-1 to a judgment issued for an overpayment of service fees); *Dale K. Barker Co. v. Sumrall*, No. 2:03-cv-00903 CW, 2012 WL 2176235, at *4 (D. Utah June 13, 2012) (applying section 15-1-1 to a contract and noting that if the party had overpaid, the interest would have applied to the overpayment); *see also Consolidation Coal*, 886 P.2d at 529 n.1) (Bench, J., concurring and dissenting) ("Prejudgment interest is designed to compensate the nonbreaching party that finds itself, by virtue of the breach, in the position of loaning money or forbearing what is owed by the breaching party. Therefore, because of the underpayment of royalties

(Continued)

only to loan contracts, we did not expressly address its application to overpayments made in connection with loan contracts. Today we further clarify that section 15-1-1 does not apply to overpayments when the overpayments were not contemplated in the underlying contract, even when the overpayments were made in connection with a contract for a loan or forbearance.

¶96 This interpretation is required under the plain language of section 15-1-1. Although section 15-1-1 contains two subsections that establish prejudgment interest rates for certain types of contracts, neither subsection applies to the judgment awarded in this case.

¶97 Subsection (1) states that "[t]he parties to a lawful contract may agree upon any rate of interest for the loan or forbearance of any money, goods, or chose in action that is the subject of their contract."[88] In other words, section 15-1-1(1) allows courts to award prejudgment interest at a rate chosen by the parties if the parties had previously agreed that the interest rate would be applied to the amounts for which judgment is awarded.

¶98 The proper application of section 15-1-1(1) may be demonstrated through a hypothetical. Imagine a typical loan contract, in which a lender agrees to lend a specified amount of money to a borrower, and the borrower agrees to pay the money back with interest at a specified rate. If the borrower fails to repay the loan and the lender prevails in an action to collect on amounts owed under the loan contract, section 15-1-1(1) authorizes the court to award prejudgment interest at the rate specified in the contract because the parties had agreed to apply it to the amounts the borrower owed the lender. But if the situation is reversed, and a borrower prevails in an action to recover amounts it inadvertently overpaid to the lender, it cannot be said that the lender agreed to pay interest on that amount—unless the contract specifies that the interest rate would apply in the event of an overpayment. So if the parties did not previously agree that the interest rate would apply to amounts owed due to overpayments, the contract does not contain an "agreed upon" interest rate under section 15-1-1(1). Such is the case here.

---

by Consol, the State found itself in the position of loaning or forbearing money it was owed." (citations omitted)).

[88] UTAH CODE § 15-1-1(1).

¶99 The Bradys' judgment was not awarded for amounts owed under an express provision of the Note. The purpose of the judgment was to compensate the Bradys for loan overpayments. And although the Note specifies that the amounts Mr. Park lent to the Bradys would accrue interest at a 10 percent interest rate, the Note does not contemplate the possibility of overpayments, much less specify an interest rate for amounts owed to the Bradys in the event of an overpayment. For this reason, we conclude that the Bradys' overpayments were not amounts owed under the terms of a contract for a loan or forbearance, and so we hold that section 15-1-1(1) did not authorize the district court to award prejudgment interest at a rate of 10 percent.

¶100 The plain language of section 15-1-1(2) compels the same result. Section 15-1-1(2) provides that "[u]nless parties to a lawful contract specify a different rate of interest, the legal rate of interest for the loan or forbearance of any money, goods, or chose in action shall be 10% per anum." Thus section 15-1-1(2) allows courts to award prejudgment interest at a rate of 10 percent if the parties to a contract for a loan or forbearance did not previously agree upon another interest rate. Because the only difference between the two subsections is that section 15-1-1(1) allows parties to establish any interest rate, whereas section 15-1-1(2) establishes a standard interest rate of 10 percent in the event the parties did not establish a specific interest rate, we conclude that, like section 15-1-1(1), section 15-1-1(2) applies only to amounts owed under the express terms of a contract for a loan or forbearance.

¶101 Because the Bradys' overpayments were not amounts owed under the express terms of a contract for a loan or forbearance, neither of section 15-1-1's subsections authorized the district court to award prejudgment interest at a 10 percent rate. Accordingly, we reverse the court's prejudgment interest award and remand for an award of prejudgment interest that is consistent with this opinion.[89]

_____

[89] We note that our determination of other issues in this case will likely affect the total damage award. In the event the district court awards damages to the Bradys on remand, it should apply a correct prejudgment interest rate. Unlike Utah's postjudgment interest statute, Utah Code section 15-1-1 does not establish a default prejudgment interest rate. So on remand the district court will have to determine which prejudgment interest rate is appropriate in this case. Although we do not decide which rate that would be here, we

(Continued)

*B. The district court erred when it awarded postjudgment interest at a 10 percent rate under Utah Code section 15-1-4*

¶102   We likewise reverse the district court's decision to award postjudgment interest at a rate of 10 percent. The district court made its postjudgment interest ruling pursuant to Utah Code section 15-1-4(2)(a). Section 15-1-4(2)(a) provides that "a judgment rendered on a lawful contract shall conform to the contract and shall bear the interest agreed upon by the parties." The district court cited this language and concluded that it applied to this case because "the statute asks whether there was an interest rate 'agreed upon by the parties,' not whether the terms of the contract contemplate the specific claim presented to the Court." We disagree with the court's interpretation.

¶103   A correct interpretation of section 15-1-4(2)(a) hinges on the meaning of the phrase "interest agreed upon by the parties." While the district court's interpretation focused on the words "agreed upon" before correctly noting that the parties had agreed upon an interest rate in the Note, its statutory analysis ended prematurely because it failed to consider the underlying debt obligation to which the parties agreed the interest rate would attach.

¶104   An interest rate—by its very nature—is derivative of some other agreed upon contractual obligation.[90] In other words, before parties can agree upon an interest rate—which will be calculated as a percentage of the amount of an underlying debt or other obligation—the parties must reach an agreement regarding the underlying debt or obligation. With this in mind, it is clear that section 15-1-4(2)(a) only authorizes the court to apply an interest rate

do note that the rate described in Utah Code section 15-1-4(3)(a), for postjudgment interest, may be an appropriate rate for a prejudgment interest award in this case. *See generally Wilcox v. Anchor Wate Co.,* 2007 UT 39, ¶ 46, 164 P.3d 353 (holding that the rate in section 15-1-1 did not apply because the case did not deal with a contract for a loan or forbearance, and instead applying a rate used in federal bankruptcy law because it was a "more appropriate prejudgment interest rate" for the case*).*

[90] This is so because an interest rate is calculated as a percentage of a principal amount. *See, e.g.*, *interest rate*, BLACK'S LAW DICTIONARY (10th ed. 2014) ("The percentage that a borrower of money must pay to the lender in return for the use of the money, usu. expressed as a percentage of the principal payable for a one-year period.").

chosen by the parties if the parties agreed that the interest rate would apply to the contractual obligation that forms the basis for the judgment award. In other words, section 15-1-4(2)(a) does not authorize courts to rewrite a contract by taking an interest rate contractually linked to one obligation and applying it to amounts owed under a different, unrelated obligation. This is especially true when the unrelated obligation had not been contemplated by the parties at the time the contract was formed.

¶105   In this case, the parties agreed that the Bradys would be obligated to repay a loan in the amount of $675,000 to Mr. Park. They then agreed upon an interest rate—10 percent—that would attach to that obligation. Importantly, the parties did not contemplate the possibility of loan overpayments, and they did not agree upon an interest rate that would attach to amounts owed to the Bradys due to loan overpayments. The district court erred, therefore, when it changed the terms of the parties' agreement by applying a 10 percent interest rate to a judicially created obligation to refund the Bradys' overpayments. For this reason, we reverse the district court's postjudgment interest determination and remand for an entry of postjudgment interest at the federal postjudgment interest rate, plus 2 percent, pursuant to Utah Code section 15-1-4(3)(a).[91]

### V. The District Court Did Not Abuse its Discretion When it Denied the Park Defendants' Rule 60(b) Motion

¶106  We now consider the Park Defendants' claim that the district court abused its discretion when it denied their rule 60(b) motion. Rule 60(b) of the Utah Rules of Civil Procedure authorizes a court to "relieve a party or its legal representative from a judgment" for a number of reasons listed in the rule.[92] When considering challenges to a court's ruling on a rule 60(b) motion, we "grant broad discretion" where the motions "are equitable in nature, saturated with facts, and call upon judges to apply fundamental principles of

---

[91] UTAH CODE § 15-1-4(3)(a) ("Except as otherwise provided by law . . . all other final civil and criminal judgments of the district court and justice court shall bear interest at the federal postjudgment interest rate as of January 1 of each year, plus 2%.").

[92] UTAH R. CIV. P. 60(b).

fairness that do not easily lend themselves to appellate review."[93] In this case we decline to disturb the district court's rule 60(b) ruling.

¶107   In their rule 60(b) motion, the Park Defendants asked the district court to amend its judgment so that the judgment's "joint and several" designation no longer applied to Bank of Utah, as custodian of the IRA, and Paul M. Halliday, as trustee.[94] They argued that the joint and several designation was a mistake under rule 60(b)(1); that it was not equitable to give the judgment prospective effect under rule 60(b)(5); and, alternatively, that their requested relief was justified under rule 60(b)(6). The Park Defendants have made the same arguments on appeal. We affirm the district court on all counts.

¶108   Rule 60(b)(1) authorizes a court to relieve a party from a judgment if the judgment was the product of a "mistake, inadvertence, surprise, or excusable neglect." The Park Defendants argue that the joint and several designation was a mistake under rule 60(b)(1) because the Bradys never sought monetary damages against the Bank of Utah or Mr. Halliday in their complaint. While the Park Defendants are correct on this point, they do not consider the grounds on which the district court awarded judgment. The judgment in this case was awarded based upon the Bradys' overpayment of amounts owed under the Note. And these overpayments were made pursuant to the district court's pre-appeal judgment for breach of contract, for which all of the Park Defendants were named plaintiffs and which resulted in a judgment in the amount of $2 million to all of the Park Defendants. Using this judgment, the Bank of Utah, acting on behalf of the IRA, foreclosed on some of the Bradys' real property. With these facts in view, we hold that the inclusion of the Bank of Utah and Mr. Halliday in an award for reimbursement was not an abuse of the district court's discretion.

---

[93] *Fisher v. Bybee*, 2004 UT 92, ¶ 7, 104 P.3d 1198.

[94] The judgment was entered against the Bank of Utah in its capacity as a custodian of the IRA and against Mr. Halliday in his capacity as trustee to two trust deeds securing the Note. Consequently, the judgment did not allow the Bradys to collect from the general assets of the Bank nor from the personal assets of Mr. Halliday.

¶109 Similarly, the district court did not abuse its discretion by rejecting the Park Defendants' rule 60(b)(5) and (b)(6) arguments. Rule 60(b)(5) authorizes a court to relieve a party from a judgment if "it is no longer equitable that the judgment should have prospective application." The Park Defendants argue that relief should have been granted under rule 60(b)(5) because "no allegations or evidence were ever presented to support" an award of prospective relief. But this argument is merely a rewording of their argument under rule 60(b)(1), and it fails for the same reason—the Bradys made overpayments to all of the Park Defendants together, so an award for reimbursement against all of the Park Defendants was within the court's discretion.

¶110 Finally, rule 60(b)(6) authorizes a court to relieve a party from a judgment for "any other reason that justifies relief." The Park Defendants argue that rule 60(b)(6) should apply in the event its other arguments do not succeed. Because the Park Defendants do not express any additional reasons in support of this last argument, it fails for the same reasons as the Park Defendants' rule 60(b)(1) and (b)(5) arguments.

¶111 In sum, because the Park Defendants together were awarded a judgment against the Bradys in the district court's first judgment, the court did not abuse its discretion by granting a reimbursement award against all of the Park Defendants in its second judgment. Accordingly, we affirm the district court's rule 60(b) ruling.

### VI. We Vacate the District Court's Decision to Award No Attorney Fees and Remand for a New Attorney Fees Award Determination

¶112 Next, we consider the district court's attorney fees determination. Both the Bradys and the Park Defendants argue that the district court erred when it declined to award attorney fees in their favor. Because our rulings on the other issues in this case may have upended the basis for the court's attorney fees decision, we decline to address the parties' arguments. Instead, we vacate the district court's previous decision and remand for a new attorney fees determination.

### VII. We Have Jurisdiction to Consider All of the Claims Brought by the Park Defendants

¶113 Finally, the Bradys argue that we do not have jurisdiction over Mr. Park's IRA on appeal because the Bank of Utah, as custodian for the IRA, failed to file a timely notice of appeal

pursuant to rules 3(d) and 4(a) of the Utah Rules of Appellate Procedure. Although we agree with the Bradys that the deficiencies in the notice of appeal deprive us of jurisdiction over the Bank of Utah, we find that our jurisdiction over the remaining Park Defendants necessarily includes jurisdiction over all of the Park Defendants' property, which in this case includes the IRA.

¶114 The omission of an IRA custodian[95] does not deprive us of jurisdiction over a self-directed IRA when we already have jurisdiction over the IRA's owner or beneficiary. Unlike a trust or a business entity, a self-directed IRA is not a legal entity that is distinct from its owner.[96] Rather, it is more akin to property such as a bank account.[97] When a court has jurisdiction over the parties to a case, the court has jurisdiction to adjudicate the parties' interests in their property.[98] Because assets held in a self-directed IRA are property of the IRA's owner, jurisdiction over the owner necessarily confers jurisdiction over the IRA and all of the assets held in the IRA. So

---

[95] At the outset, we must highlight the fact that the Bank of Utah was joined to this case only in its role as custodian of the IRA.

[96] *See Regions Bank v. Kaplan*, No. 8:16-cv-2867-T-23AAS, 2017 WL 2868413, at *1 (M.D. Fla. Apr. 10, 2017) ("The predominant weight of authority holds that a plaintiff can sue the beneficiary of a self-directed IRA for the IRA's alleged wrongdoing because the self-directed IRA 'is not a separate legal entity from its owner.'" (citation omitted)); *United States v. Bailey*, No. 1:11cr10, 2012 WL 569744, at *5, n.5 (W.D.N.C. Feb. 22, 2012) (noting that "[b]ecause an IRA is not a separate legal entity from its owner," the owner of the IRA is the true beneficial owner of the property deposited therein); *Myers v. Walker*, 61 S.W.3d 722, 726 n.1 (Tex. Ct. App. 2001) (suggesting that the owner of an IRA is not distinct from the IRA).

[97] *See, e.g.*, *In re Vaughan Co., Realtors*, No. 10-10759, 2014 WL 271632, at *3 (Bankr. D.N.M. Jan. 23, 2014) ("A self-directed IRA, like a savings account, is not a separate legal entity from its owner.").

[98] *See, e.g.*, *Aequitas Enters., LLC v. Interstate Inv. Grp., LLC*, 2011 UT 82, ¶ 10, 267 P.3d 923 ("[W]hen a court has personal jurisdiction over the parties to a case, the court has jurisdiction to adjudicate the parties' interests in real property, even if the property is not located in that state. Here, the court unquestionably has personal jurisdiction and therefore has the ability to order the parties to act on their property." (citations omitted)).

Mr. Park and the Park Trust's notice of appeal was sufficient to grant us jurisdiction over them and all of their assets, including the IRA.[99]

¶115   Additionally, we note that a corollary of this rule is that when we have jurisdiction over an owner of an IRA—including his or her interest in the IRA—the owner necessarily has standing to bring or defend claims directly implicating his or her interest in the IRA. Accordingly, we have frequently adjudicated interests in an IRA where the owner of the IRA, but not the IRA or the IRA's custodian, was joined as a party.[100]

¶116 This approach is followed in other jurisdictions. For example, in *FBO David Sweet IRA v. Taylor*,[101] a federal district court in Alabama ruled that the owner of a self-directed IRA was a proper party-plaintiff in a case involving assets deposited in an IRA because "it is the owner of the Self–Directed IRA who manages, directs, and controls the investments."[102] So the court concluded that "the owner

---

[99] In so holding we note that the Bank of Utah, as custodian of the IRA, was only joined to this case as part of the Bradys' claim for injunctive relief, and its presence was never necessary for the other Park Defendants to defend their interests in the IRA.

[100] *See Dahl v. Dahl*, 2015 UT 79, ¶¶ 142–45, ---P.3d--- (adjudicating the parties' interest in an IRA even though the IRA and its custodian were not included as parties); *Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 8, 201 P.3d 1004 (noting that under a federal retirement benefit statute an IRA plan "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights to future benefits under the terms of the plan, or to clarify his rights under the terms of the plan" (citation omitted) (internal quotation marks omitted)); *In re Kunz*, 2004 UT 71, ¶¶ 2, 13, 99 P.3d 793 (adjudicating interests in several IRAs, even though the IRAs and their custodians were not included as parties); *Estate of Anello v. McQueen*, 953 P.2d 1143, 1145–47 (Utah 1998) (adjudicating the parties' interests in two IRAs, even though the IRAs and their custodians were not listed as parties); *In re Matter of Estate of Hunt*, 842 P.2d 872, 873 (Utah 1992) (noting that a beneficiary of an estate had standing to pursue an appeal despite the fact that the beneficiary had resigned as personal representative of the estate after filing his notice of appeal).

[101] 4 F. Supp. 3d 1282 (M.D. Ala. 2014).

[102] *Id.* at 1285.

or beneficiary of the IRA acts as a trustee for all intent and purposes" whereas the bank custodian "served as merely a holding company" of the owner's property.[103]

¶117   Similarly, in *Deem v. Baron*[104] the federal district court of Utah held that an IRA's custodian bank was not the proper party to litigate issues related to IRA contracts. After acknowledging the logic of the *FBO David Sweet IRA* opinion, the court explained that because the custodian bank "ha[d] not been involved in the decision-making process, it lack[ed] the knowledge of the facts which would allow it to bring th[e] action [in the case]."[105] In contrast, the court held that the owners of the IRA were the "true parties in interest" in the litigation because "they are the ones most knowledgeable of all of the facts and circumstances surrounding those contracts" and "they are also the ones for whose benefit all of the transactions were performed."[106] Accordingly, the court concluded that the owners of the IRA had standing to prosecute the case. So both *FBO David Sweet IRA* and *Deem* illustrate that our treatment of the IRA in this case is consistent with the treatment given to IRAs in other jurisdictions.

¶118   In sum, jurisdiction over a party also confers jurisdiction over the party's property. This is true even when the property in question is an IRA. And if we have jurisdiction to adjudicate a party's interest in his or her IRA, that party necessarily has standing to bring or defend claims implicating his or her interest in the IRA. In this case, the Bradys do not challenge our jurisdiction over Mr. Park individually or as trustee of the Park Trust. Because the Park Trust owns the IRA, we also have jurisdiction over the IRA, and Mr. Park—as trustee of the Park Trust—has standing to defend the Trust's interest in the IRA on appeal. Accordingly, we hold that although we do not have jurisdiction over the Bank of Utah, as

---

[103] *Id.; see also Vannest v. Sage, Rutty & Co.*, 960 F. Supp. 651, 658 (W.D.N.Y. 1997) ("Because Vannest controlled the investment decisions, he certainly was a purchaser/seller for all practical purposes. Investors in self-directed IRAs have standing as 'purchasers/sellers' to assert claims under the securities laws.").

[104] No. 2:15-cv-00755-DS, 2016 WL 8230425 (D. Utah Apr. 14, 2016).

[105] *Id.* at *2.

[106] *Id.*

custodian of the IRA, we nevertheless have jurisdiction over the IRA and the Park Trust's interest in it.

**Conclusion**

¶119 Although the district court was not precluded by the mandate rule from determining that the Note does not require the Bradys to pay any incurred 10 percent late fee amounts to bring the Note current, we hold that the court erred in making this determination because it did so by construing an ambiguity in the Note against the Park Defendants, as drafters, without first considering extrinsic evidence. Accordingly, we remand for a new determination after the court considers relevant extrinsic evidence.

¶120 Additionally, we affirm the district court's determination, because it was not clearly erroneous, that extrinsic evidence showed that the parties did not intend the Note's 10 percent late fee to apply to the final payment.

¶121 Further, we reverse the district court's acceptance of payment dates that differed from the payment dates it accepted before the first appeal because this determination violated the mandate rule.

¶122 We also reverse the district court's award of pre- and postjudgment interest at a 10 percent rate to the Bradys because Utah Code sections 15-1-1 and 15-1-4 do not authorize an award of interest at that rate. Accordingly, upon remand if the court awards a judgment to the Bradys, it should apply the correct pre- and postjudgment interest rates.

¶123 Additionally, we affirm the district court's ruling on the rule 60(b) motion because it was not clearly erroneous. But we reverse the district court's attorney fees determination and remand for a new attorney fees determination.

¶124 Finally, we conclude that we have jurisdiction over the IRA, through the IRA's owner, even though we do not have jurisdiction over Bank of Utah, as the IRA's custodian. We accordingly remand to the district court for proceedings consistent with this opinion.

———————

A.C.J. Lee, concurring in part and dissenting in part

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and dissenting in part:

¶125   I agree with and concur in much of the majority opinion in this complex case. But I respectfully disagree with the court's decision to reverse and remand to allow the parties to present extrinsic evidence on the question of "what is required to bring the Note current under the 20 percent default interest provision." *Supra* ¶ 59. Unlike the majority, I find no "ambiguity" in this provision sufficient to open the door to extrinsic evidence. Instead I would conclude that the default interest provision applies to any and all outstanding debts under the Note and that these debts must be paid in order for the Note to be "brought current."

¶126   This strikes me as the better interpretation of the terms of the parties' agreement. And because this question can be adequately resolved on the basis of the written agreement I would hold that there is no basis for a remand.

¶127 My disagreement with the majority highlights an important ambiguity lurking in the background of our analysis in a case like this one. The ambiguity concerns the very notion of contract *ambiguity*—or in other words ambiguity about what it means for competing parties both to offer a "reasonable" interpretation of the contract provision in question. Our cases have never been very clear about the nature of ambiguity sufficient to open the door to extrinsic evidence. Put differently, we have never said what it means for both sides to have a "reasonable" interpretation. I would clarify this important point of contract law doctrine here. I would do so by holding that a contract is "ambiguous" enough to allow a court to consider extrinsic evidence if and only if the parties' competing interpretations of a contract are equally (or at least roughly equally) plausible. And I would conclude that the Note in this case is not ambiguous in this sense, but is better interpreted as requiring a default interest payment on any and all outstanding debts payable under the Note (and thus necessary for it to be "brought current").

¶128   In the paragraphs below I first set forth the need and basis for the clarification in our law that I propose. Then I respond to the majority's criticisms of my approach, including its puzzling assertion that the doctrine of *stare decisis* somehow bars my bid to clarify an element of our law that has never been defined but leaves the majority free to make the clarification that it prefers. *See supra* ¶ 54 n.39. And I conclude by explaining why I think the terms of the Note at issue here are not sufficiently ambiguous to warrant a decision to open the door to the presentation of extrinsic evidence.

I

¶129 We have long said that a provision of a contract is ambiguous if "it is capable of more than one *reasonable* interpretation because of uncertain meanings of terms, missing terms, or other facial deficiencies." *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 64, 266 P.3d 671 (emphasis added) (quoting *Glenn v. Reese*, 2009 UT 80, ¶ 10, 225 P.3d 185), *abrogated on other grounds by Mounteer Enters., Inc. v. Homeowners Ass'n for the Colony of White Pine Canyon*, 2018 UT 23, 422 P.3d 809. Yet we have never been very clear about what this means.

¶130 We have emphasized that it is not enough that two parties offer competing interpretations of a contract provision. *R&R Energies v. Mother Earth Indus., Inc.*, 936 P.2d 1068, 1074 (Utah 1997). Thus, we have stated that each competing interpretation must be "reasonable"—or "tenable." *See Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990) ("To demonstrate ambiguity, the contrary positions of the parties must each be tenable."). And we have underscored the need to consider the "contract as a whole" in assessing this question—"[e]ach contract provision . . . in relation to all of the others." *Utah Valley Bank v. Tanner*, 636 P.2d 1060, 1061–62 (Utah 1981). Yet we have never been very clear about what it means for two competing interpretations to be "reasonable" or "tenable."

¶131 This is a significant ambiguity. A judicial determination of ambiguity opens the door to extrinsic evidence of the intent of the parties to a contract—and, eventually, to the possible application of a canon of construction (like the canon of construing ambiguities against the drafter). *See supra* ¶ 56 (quoting *Meadow Valley Contractors*, 2011 UT 35, ¶ 64). Such a determination is likely to be a matter of great consequence to the parties. When a court opens the door to extrinsic evidence it substantially increases the cost of resolving a dispute over the meaning of a contract provision. *See* Omri Ben-Shahar & Lior Jacob Strahilevitz, *Interpreting Contracts Via Surveys and Experiments*, 92 N.Y.U. L. Rev. 1753, 1762–63, 1757–58 (2017); Alan Schwartz & Robert E. Scott, *Contract Interpretation Redux*, 119 Yale L.J. 926, 953, 963 (2010). And, all else being equal, we can assume that parties to a contract will prefer quick, inexpensive means of resolving contract disputes. Schwartz & Scott, *supra* at 944–47.

¶132 All else may not be equal. The decision to open the door to extrinsic evidence may produce not just costs but also benefits—by enhancing the accuracy of a judicial decision (in accurately assessing

the contracting parties' intent). *Id.* at 930 (explaining that courts can often "minimize interpretive error by hearing all relevant and material evidence"). And it could make good sense to open the door to extrinsic evidence in contract cases if and when this benefit outweighs the cost of more drawn-out litigation. *See id.* at 946.

¶133 This is an important policy question that drives some points of conflict in the law of contract interpretation. When courts embrace a hard "parol evidence rule" or "plain meaning" canon of contract interpretation they are implicitly concluding that the adjudication costs of opening the door to extrinsic evidence outweigh any benefits in the form of improving accuracy of judicial decision-making. *See* Ben-Shahar & Strahilevitz, *supra* at 1762. This is the so-called "New York" rule of contract interpretation.[107] The contrary approach is sometimes referred to as the "California rule."[108] It seems premised, at least in part, on a contrary determination—that the benefits of more accurately assessing the parties' intent are sufficient to justify the increase in costs associated with opening the door to extrinsic evidence.

¶134 Our Utah cases have embraced the New York approach— at least in part. *See Tangren Family Tr. v. Tangren*, 2008 UT 20, ¶ 11, 182 P.3d 326 ("[I]f a contract is integrated, parol evidence is admissible only to clarify ambiguous terms; it is 'not admissible to vary or contradict the clear and unambiguous terms of the contract.'" (quoting *Hall v. Process Instruments & Control, Inc.*, 890 P.2d 1024, 1026–27 (Utah 1995)); *Daines v. Vincent*, 2008 UT 51, ¶ 25, 190 P.3d 1269 ("[B]efore permitting recourse to parol evidence, a court must make a determination of facial ambiguity."); *Peterson v.*

---

[107] *See* Schwartz & Scott, *supra* at 959–60; *see, e.g.*, *In re Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 679 N.E.2d 624, 627 (N.Y. 1997) (giving conclusive effect to a merger clause); *Intershoe, Inc. v. Bankers Tr. Co.*, 571 N.E.2d 641, 644 (N.Y. 1991) (enforcing a default rule excluding extrinsic evidence when a writing appears to embody a final agreement).

[108] *See* Schwartz & Scott, *supra* at 960–61; *see, e.g.*, *Garcia v. Truck Ins. Exch.*, 682 P.2d 1100, 1104 (Cal. 1984) (en banc) (explaining that the parol evidence rule does not exclude "evidence of the circumstances under which the agreement was made or to which it relates . . . or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement" (alteration in original) (citation omitted)).

*Sunrider Corp.*, 2002 UT 43, ¶ 18, 48 P.3d 918 ("If the language of the contract is unambiguous, the intention of the parties may be determined as a matter of law based on the language of the agreement.").

¶135 Notwithstanding these important holdings, we have not yet resolved a related question that is lurking beneath the surface in a case like this one—what do we mean by "ambiguity" or competing "reasonable" or "tenable" interpretations?[109] Our cases have used a range of different terms in describing the operative standard. *See supra* ¶ 55 n.42. Without some clarification of the nature of this standard, we perpetuate a risk of arbitrary applications of an important threshold standard in contract interpretation.

¶136 We can, and should, eliminate this ambiguity about "ambiguity" in contract interpretation. I would do so by stating that we find ambiguity sufficient to open the door to extrinsic evidence only where the parties' competing interpretations are of equal (or at least roughly equal) plausibility. Put differently, I would say that we look to extrinsic evidence only as a sort of "tie-breaker"—to resolve very close calls on the best interpretation of the four corners of a written contract.[110]

---

[109] In fairness, we are not alone. I have found no court in any other jurisdiction that has answered the important question that is implicated here. Most all courts, it would seem, are content to reside in a world of ambiguity about ambiguity. Stephen C. Mouritsen, Contract Interpretation with Corpus Linguistics 5 (Aug. 30, 2018) (unpublished manuscript) (available on SSRN) ("In spite of its conceptual importance in the interpretation of contracts, courts lack a coherent, shared, well-defined, objective definition of what ambiguity actually means."). But that is no reason to remain in this uncertain place. Our courts generally have suffered from a startling lack of familiarity with principles and practices of linguistics. Thomas R. Lee & Stephen C. Mouritsen, *Judging Ordinary Meaning*, 127 YALE L.J. 788, 794–95 (2018). It is time we begin to remedy that problem.

[110] The majority highlights a related point of ambiguity in our case law. It notes that we have said that we resolve ambiguities against the drafter only where "extrinsic evidence 'does not reveal the intent of the parties.'" *Supra* ¶ 56 (quoting *Meadow Valley Contractors*, 2011 UT 35, ¶ 69). But that formulation begs a parallel

(Continued)

A.C.J. Lee, concurring in part and dissenting in part

¶137 This approach would minimize the risk of arbitrary application of the law. It would also streamline the process of contract dispute resolution in a manner that is likely reflective of the preferences of contracting parties. *See* Schwartz & Scott, *supra* at 944–47.

¶138 A party who enters into a written contract will not likely be in a position to predict whether the eventual use of extrinsic evidence will help or hurt its cause in an anticipated dispute about contract meaning. Contracting parties thus are likely to prefer streamlined rules of interpretation that tend to limit review to the four corners of the contract. This is more than a theoretical proposition. It seems amply borne out by empirical evidence — in the fact that parties overwhelmingly go out of their way to direct courts to ignore extrinsic evidence and to consider only the terms of their written agreement, and (relatedly) opt for New York law over California law in forum-selection clauses.[111]

---

question of what degree of ambiguity warrants resort to this kind of canon of construction. This is another important question that merits our attention in an appropriate case. Perhaps some of the analysis I have presented here may be of use to our clarification of this important point in our law. I do not propose to resolve this question here, however, as it is not necessary to the resolution of this case.

[111] *See* Lisa Bernstein, *Merchant Law in a Merchant Court: Rethinking the Code's Search for Immanent Business Norms*, 144 U. PA. L. REV. 1765, 1769–70, 1771–77, 1816–20 (1996) (revealing that a more formalistic, textualist approach is favored among merchants); Theodore Eisenberg & Geoffrey P. Miller, *The Flight to New York: An Empirical Study of Choice of Law and Choice of Forum Clauses in Publicly-Held Companies' Contracts*, 30 CARDOZO L. REV. 1475 (2009) (showing that parties prefer New York law to other law by empirically reviewing choice of law and forum-selection clauses in contracts).

The majority correctly notes that these empirical studies examined contract disputes between sophisticated business entities. But I see no reason why unsophisticated parties would prefer a different approach. They are in no better position to know *ex ante* whether the use of extrinsic evidence will help or hurt their cause. And the majority has not proffered a standard that accounts for its policy concern. *See infra* ¶¶ 155–59. It has opted not to provide a standard.

A.C.J. Lee, concurring in part and dissenting in part

¶139   Our contract law should reflect our best assessment of the contracting parties' likely preferences on the governing rules of contract interpretation. This is an important function of gap-filler rules in contract law. *See* Schwartz & Scott, *supra* at 941, 957. If we think it likely that contracting parties will prefer streamlined rules of interpretation (as I do), our law should reflect this background rule. The parties to a contract may then draft around the rule if they prefer a different approach. *Id.* at 944; Ian Ayres & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules*, 99 YALE L.J. 87, 87 (1989) ("Default rules fill the gaps in incomplete contracts; they govern unless the parties contract around them."). And our law can then defer to their contrary view.

¶140   I would embrace such an approach here. And I would accordingly adopt a clarifying—and limiting—notion of the kind of "ambiguity" sufficient to open the door to extrinsic evidence in Utah.

II

¶141   The majority criticizes my proposed clarification of our law on three principal grounds. First, it claims that the doctrine of *stare decisis* somehow bars us from clarifying an ambiguous tenet of our case law. Second, it asserts that my proposed standard is no clearer than the majority's. And third, it contends that the policy grounds for my approach will not always hold. I find none of these critiques persuasive.

A

¶142   The majority places great weight on the doctrine of *stare decisis*. It accuses me of "brush[ing] aside sixty years of our caselaw" and of urging a "significant departure from our longstanding approach to contract interpretation." *Supra* ¶¶ 54 & 55 n.42. But this critique is puzzling on several counts.

¶143   First, our precedent is either silent or inconsistent on the question that I am proposing to clarify. And nothing in the law of *stare decisis* forecloses a clarification of an unclear body of case law.

¶144   The majority concedes the lack of clarity in our case law. At one point it admits that "we have used the term 'reasonable' repeatedly for decades without defining the term further." *Supra* ¶ 55. And elsewhere it acknowledges that we have also used an alternative term—"plausible"—in identifying the threshold for ambiguity in this field. *Supra* ¶ 54 n.39. That term has also remained undefined in our case law.

A.C.J. Lee, concurring in part and dissenting in part

¶145 Our cases are at best silent on what it means for two competing interpretations of a contract to be "reasonable" or "plausible." That alone should be enough to defeat the applicability of the doctrine of *stare decisis*. If we have failed to define an operative term for decades we can hardly be foreclosed from doing so as a matter of *stare decisis*. That notion of *stare decisis* would make no sense. It would say that our past failure to elucidate the meaning of an undefined term in our precedent precludes us from ever doing so going forward. That cannot be right. *See In re Adoption of Baby B.*, 2012 UT 35, ¶ 60 n.23, 308 P.3d 382 (explaining that a key policy undergirding the principle of *stare decisis* is "reinforced by a decision that clarifies ambiguities in past opinions").

¶146 But silence is the lesser of the two evils present in our case law. Our precedents are also inconsistent. As Judge Connors notes, a standard of *plausibility* seems quite a bit lower than a standard of *reasonableness*. *Compare infra* ¶ 178 n.122 (Connors, J., concurring in part and dissenting in part) (providing definitions of the word "plausible"), *with* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1892 (2002) (defining "reasonable" as "being in agreement with right thinking or right judgment; not conflicting with reason; not absurd"). The "more than conjecture" standard used in our caselaw seems even further removed. *Infra* ¶ 148 n.113; *see* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 479 (2002) (defining "conjecture" as "an inference or conclusion drawn or deduced by surmise or guesswork"). If it is enough for both of two interpretations of a contract to be "more than conjecture," the door will be open wide to the admissibility of extrinsic evidence.

¶147 Our law as it currently stands is a grab bag. A judge who prefers to enforce a careful limit on the admissibility of extrinsic evidence can do so under the notion of "reasonableness" that I have proposed. But no judge is bound by that standard. If the judge prefers to open a wider door to extrinsic evidence she can cite the "more than conjecture" standard. These two notions of reasonableness cannot peacefully coexist. And the doctrine of *stare decisis* surely does not foreclose us from resolving the tension in our case law.[112]

---

[112] *See Washington Cty. Sch. Dist. v. Labor Comm'n*, 2015 UT 78, ¶¶ 24–37, 358 P.3d 1091 (noting the use of different standards in our cases and taking the opportunity to clarify the appropriate

(Continued)

A.C.J. Lee, concurring in part and dissenting in part

¶148 The majority seeks to avoid this problem by equating the terms "plausible" and "reasonable" going forward. Citing some language in some of our opinions, the court insists that "we have treated" the term "plausible" as if it "had roughly the same meaning as the term 'reasonable.'" *Supra* ¶ 54 n.39. To support this assertion, the majority notes that the terms are often used near each other in our opinions. That's true. But it does not follow that the two terms are synonymous. There is good reason to believe that a *plausibility* standard is lower than a *reasonableness* standard. Again I think that follows from the text of our opinions and from the ordinary meaning of "plausible."[113] *See supra* ¶¶ 144, 146.

¶149 The majority's response to this problem, moreover, just underscores the need for clarification in this area. Ultimately all the majority is really saying is that it believes a clarification is necessary. And the clarification it selectively chooses is that "plausible" essentially means "reasonable."

¶150 This leads to the second problem with the majority's *stare decisis* analysis. The court itself is proposing to clarify our law in this field—by saying that when we use the term "plausible" we really

---

standard); *In re Adoption of Baby B.*, 2012 UT 35, ¶ 60 n.23, 308 P.3d 382 (clarifying a "latent ambiguity[y]" in our precedent and explaining that "[s]uch a decision is entirely consistent with the principle of *stare decisis*").

[113] The body of Utah case law is difficult to square with the majority's conclusion. To date this body of law has not been viewed as equating *plausibility* and *reasonableness*. Instead our cases have been understood to allow for an independent showing of plausibility as a means of proving ambiguity. *See, e.g.*, *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶¶ 15–17, 133 P.3d 428 (discussing at length the term "plausible" and how it is used as a standard in contract interpretation); *Bennett v. Huish*, 2007 UT App 19, ¶ 21, 155 P.3d 917 (relying on a plausibility standard); *Prop. Assistance Corp. v. Roberts*, 768 P.2d 976, 977 (Utah Ct. App. 1989) (same). Further, this is hardly the only point of inconsistency in our case law in this field. We have also suggested that a contract is ambiguous where there are at least two interpretations that rise to "more than a conjecture." *See Saleh*, 2006 UT 20, ¶ 17. Elsewhere we have said that "[t]o demonstrate ambiguity, the contrary positions of the parties must each be tenable." *Plateau Mining Co. v. Utah Div. of State Lands & Forestry*, 802 P.2d 720, 725 (Utah 1990).

A.C.J. Lee, concurring in part and dissenting in part

mean "reasonable" (while still stopping short of defining the latter term). Having done so, however, the majority is in no position to criticize me for proposing further clarification. I don't think the law of *stare decisis* forecloses the need to clarify an unclear or unworkable legal standard. *See Carter v. Lehi City*, 2012 UT 2, ¶ 6, 269 P.3d 141 (explaining that "[a] decision to clarify unworkable precedent does not undermine but advances" a key goal of *stare decisis*). But surely no version of that doctrine allows the majority to advance whatever points of clarification it favors while dismissing my further clarification as an unceremonious "brush[ing] aside" of "sixty years of our case law."[114]

---

[114] For these and other reasons I am puzzled by the majority's reminder that "the parties have not asked" us to revisit the standard set forth in our cases. *Supra* ¶ 55 n.45. I do not see that as a barrier to my bid for transparency. The parties *have* asked us to apply the standard set forth in our cases—to decide whether the parties' competing interpretations are both *reasonable*. And we can't apply that standard without explaining what it means. *See GeoMetWatch Corp. v. Utah State Univ. Research Found.*, 2018 UT 50, ¶ 31, 428 P.3d 1064 (reaffirming that courts, and not the parties, declare the meaning of the law); *First of Denver Mortg. Inv'rs v. C.N. Zundel & Assocs.*, 600 P.2d 521, 527 (Utah 1979) (explaining that courts are not bound by the parties' stipulations "when points of law requiring judicial determination are involved").

The point of our writing opinions is to pull back the curtain on the basis for our decision. My proposed approach is just a bid for further transparency. *See Winward v. State*, 2012 UT 85, ¶ 44, 293 P.3d 259 (Lee, J., concurring in the judgment) (making a similar point in the context of a concern about a lack of clarity as to the basis for or content of a statutory standard in the Post-Conviction Remedies Act; asserting that it is not an act of "judicial restraint" to decline to define a standard that the court is applying, but instead "is an effective assumption of power—an assumption in a black box without any indication of its basis in law"). I see no basis for foreclosing that move.

It is worth noting, moreover, that the majority sees the lack of briefing from the parties only as a barrier to the clarification that I seek—not the one that it favors. Further briefing could certainly be useful. I would be open to supplemental briefing from the parties on the proper meaning of "reasonableness" in our case law. But I am

(Continued)

A.C.J. Lee, concurring in part and dissenting in part

B

¶151   The majority also expresses confusion or frustration with the standard that I propose. It says that I either fail to "clarify what a reasonable interpretation would be," *supra* ¶ 55 n.42, or that I "exclude[]" "any consideration of whether" two competing interpretations are "reasonable," *supra* ¶ 54 n.41. But neither point correctly characterizes my approach. And the majority's critiques reveal the circularity of its own standard.

¶152   I propose to speak directly to what I see as missing from the standard set forth in our cases—to what it means for there to be two "reasonable" interpretations of a contract provision. I suggest that the clearest—and best—way to speak to that question is to say that two interpretations of a contract are both "reasonable" when they are of at least roughly equal plausibility. *See supra* ¶ 136. I suppose it's true that we have "never applied" this standard in our past cases. *Supra* ¶ 55 n.42. But it misses my whole point to highlight this as a bug in my theory. This is my theory's central feature. And it is built on the idea that we have never spoken specifically to what it means for two interpretations to be "reasonable"—and need to do so here.

¶153   The point is not that our courts should refuse to decide whether two competing interpretations are "reasonable," *supra* ¶ 54 n.41—much less that we should "disregard one reasonable interpretation of a contract" in favor of an alternative interpretation that the court deems "preferable," *supra* ¶ 55 n.45. These formulations beg the central question—of what it means for an interpretation to be "reasonable." And I'm saying that our courts should define "reasonableness" in terms of roughly equal plausibility.

¶154   Under my proposed standard, a court would determine whether two interpretations are "reasonable" by deciding whether both are roughly equally plausible interpretations of a contract. A court could reject one interpretation not by deciding that the other is "preferable" in some vague, abstract sense but by concluding that it is much less plausible than the alternative.[115] My approach thus does

not impressed by the criticism that I am doing something untoward when it is leveled by a majority that is engaging in a similar exercise.

[115] The majority says that this approach is called into question by our case law. *Supra* ¶ 55 n.45 (citing *Meadow Valley Contractors, Inc. v. State Dep't of Transp.*, 2011 UT 35, ¶ 69, 266 P.3d 671). But *Meadow*

(Continued)

A.C.J. Lee, concurring in part and dissenting in part

not "expand . . . contract interpretation . . . by adding an additional step" of analysis. *Supra* ¶ 55 n.45. It simply represents an effort to clarify the first step in interpreting a contract—what constitutes a "reasonable" interpretation.

¶155 My proposal is a move in the direction of increased transparency. The majority, by contrast, shrouds the standard of "reasonableness" in a question-begging formulation that perpetuates the risk of arbitrariness and inconsistency.

¶156 The majority insists that "we have provided a consistent explanation for what constitutes a reasonable interpretation." *Supra* ¶ 55. It says that "a reasonable interpretation is an interpretation that cannot be ruled out . . . as one the parties could have *reasonably* intended." *Supra* ¶ 55 (emphasis added). Yet this formulation is circular. It defines reasonableness in terms of what is reasonable. That leaves the matter undefined. It does not tell us *how* reasonable a competing interpretation must be, or what it means to be reasonable.

¶157 Perhaps that question can never be answered with mathematical certainty. But we can try to give it some discernible content. That is my proposal. And a responsive critique that says

---

*Valley* does not speak to the question that I'm addressing—to the standard of contract *ambiguity*, or to what it means for two interpretations to be sufficiently "reasonable" to open the door to extrinsic evidence. It addresses a subsequent question that goes to the standard for choosing between two competing interpretations *after* that door has been opened. *Meadow Valley Contractors*, 2011 UT 35, ¶ 64 (stating that *after* a contract is found to be ambiguous, courts should "resolve the ambiguity by looking to extrinsic evidence of the parties' intent"). Certainly it's true that at that stage we have said that it is error to "cursorily conclude[]" that one of two interpretations is better *without* considering extrinsic evidence. *Id.* ¶ 69. But that just means that we have been clear about the approach courts should take once the door is opened to extrinsic evidence. The question I'm highlighting—for many reasons a very significant one—is at an earlier stage. And the majority has no support for its suggestion that I'm somehow overriding existing case law on the standard of *reasonableness* at this threshold stage. We have never said what that means. We should do so here.

reasonable means *reasonable* is no answer; it is a guarantee of arbitrariness.[116]

¶158 As judges we are responsible to make our decisions in accordance with the rule of law. We fail to do so when we take an "I know it when I see it" way out. *See Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring). Such is not law. It is an assertion of a judicial prerogative to do what's right on a case-by-case basis. And when we do that we open up the possibility—or more accurately the guarantee—that our law will mean something different in different courts in our system.

¶159 Where possible, we should identify the legal rule that governs our decisions. When we decline to do so we open the door to decision-making on the basis of personal predilections or prejudices of our judges. We can and should do better.

---

[116] The majority claims that my approach "suffers from the same deficiency" that plagues the imprecise standard now set forth in our cases. *Supra* ¶ 55 n.45. In making this claim the majority highlights the imprecision in the term "plausible," and insists that my approach puts all the weight on that term. But that critique misstates the clarification I propose. I am not proposing to substitute the word "plausible" for "reasonable." I am proposing a precise statement of the governing legal standard, whichever adjective we use—that "we find ambiguity sufficient to open the door to extrinsic evidence only where the parties' competing interpretations are of equal (or at least roughly equal) plausibility." *Supra* ¶ 136. I am suggesting, in other words, that we turn to extrinsic evidence only to resolve very close calls between competing interpretations of a contract—as a sort of tiebreaker.

Under my approach the courts would still retain some discretion to decide whether the parties' proffered interpretations are of equal (or near equal) plausibility. But my approach would narrow that range of discretion and thus limit the amount of arbitrariness and inconsistency. Thus, I am not proposing to give district courts new discretion to "disregard one reasonable interpretation" if they believe it is less reasonable or plausible than another. *Supra* ¶ 55 n.45. I am simply suggesting that district courts and litigants should know what constitutes a "reasonable" interpretation.

A.C.J. Lee, concurring in part and dissenting in part

C

¶160   The majority's final critique is a response to a policy argument for the tie-breaker notion of "reasonableness" that I have identified—the logical and empirical support for the idea that contracting parties prefer streamlined rules of interpretation that tend to limit review to the four corners of the contract. *See supra* ¶¶ 137–38. While acknowledging this point, the majority insists that "it is not necessarily true in every case that parties would prefer a quick and inexpensive resolution over an accurate result—especially in cases involving parties who do not litigate frequently." *Supra* ¶ 55 n.45.

¶161   I take that point. That is why I propose a rule that would function as a default. If contracting parties prefer accuracy above all else (or at least above litigation costs), they can make that clear by drafting into the contract a rule that opens a wider door to the consideration of extrinsic evidence.

¶162   The majority's point, at most, is that *some* parties may prefer this wider door. Yet I have cited empirical support for the likely preference of a majority of contracting parties, *see supra* ¶ 138 n.111, and the majority has presented no basis for its contrary view.

¶163   The majority, in all events, has not articulated a standard that is sensitive to the nuance that it introduces. It has not said that we should decide on the required level of *reasonableness* of competing contract interpretations based on an indication of the parties' appetite for expensive litigation. Indeed it has not articulated any standard at all. That seems to me the worst of all of the options before us. If the majority prefers a wider door for extrinsic evidence—if it wishes to open the door whenever the parties present plausible but not equally reasonable interpretations—then it should say so. And it should offer a reason for that standard. But unless and until it does so I do not see how the majority is in a position to criticize my proposed move in the direction of greater transparency.

III

¶164   Applying the standard set forth above, I would hold that there is no "ambiguity" in the terms of the default interest provision of the Note at issue here. The operative text of the Note states that "[i]f payment is not made within 5 days of due date the entire balance shall bear interest at a rate of 20 percent until note is brought current." The question presented is what is meant by "brought current." In the Park Defendants' view the Note may be brought current only if all payments due under the Note (all installment

A.C.J. Lee, concurring in part and dissenting in part

payments and all late fees) are made. The Bradys view this provision differently. Because the default interest provision is triggered only by a late *installment payment*, the Bradys insist that they can bring the Note current by making up only the late installment payments.

¶165   The majority deems both interpretations "reasonable." I disagree.

¶166   The Bradys' interpretation could be deemed "reasonable" if *any degree of plausibility* were sufficient to open the door to extrinsic evidence. But that is not how I would view the notion of "reasonableness" (or of "ambiguity"). For reasons highlighted above, I would find ambiguity only in the face of two interpretations of at least roughly equal plausibility. And here I do not find that kind of ambiguity.

¶167   It is true, as the majority notes, that "[t]he phrase 'brought current' is not defined . . . in the Note." *Supra* ¶ 60. But that doesn't render the contract ambiguous. The default interest provision is ambiguous only if we are unable to discern the better interpretation of the terms of the contract. And I see a clear path to resolving the parties' dispute on the four corners of the Note.

¶168   "[B]rought current" is not ambiguous. In this linguistic context, "current" means "belong[ing] to" the applicable "period of time," or in other words up to date.[117] And an account like the one at issue here can be brought up to date only if all amounts owing are paid in full. No one would say that a debtor's account is "brought current" by a mere partial payment of amounts owing to a creditor.

¶169   Here there is no question that the Bradys owed more than just late installment payments to the Parks; they also owed unpaid late fees. The Bradys' interpretation should be rejected on that basis. They do not present a reasonable construction because they fail to credit the plain language of the Note.

---

[117] *Current*, OED ONLINE (July 2018), http://www.oed.com.erl.lib. byu.edu/view/Entry/46097?rskey=FpbUxN&result=2&isAdvanced =false#eid; *see also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 446 (5th ed. 2011) (defining "current" as "[b]elonging to the present time"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 557 (2002) (same).

J. CONNORS, concurring in part and dissenting in part

¶170 It is true, as the majority notes, that "it is only the failure to timely pay installment payments—and not a failure to pay the other two types of payments contemplated in the Note—that triggers the 20 percent default interest." *Supra* ¶ 62. But that does not sustain the conclusion that "the phrase 'brought current' within the provision refers only to the payment of late installment payments." *Supra* ¶ 62. It indicates only that the obligation to bring the account "current" is triggered by a late installment payment.

¶171 I would resolve this issue on the basis of the language of the Note. I would hold that the Bradys were required to pay any and all unpaid amounts under the Note in order to bring it "current" under the default interest provision. And I would not remand for the presentation of extrinsic evidence on this issue.[118]

———————

JUDGE CONNORS, concurring in part and dissenting in part:

¶172 I concur in large part with the majority opinion. Specifically, I concur with Parts II through VII of that opinion.

———————

[118] In Section II of the majority opinion, the majority affirms the district court's interpretation of the Note's 10 percent late fee provision. *Supra* ¶¶ 66–77. It does so because even if the Parks' alternative interpretation was reasonable, "[t]he district court's factual determination regarding the 10 percent late fee provision's application to the final [balloon] payment was not clearly erroneous." *Supra* ¶ 72. I agree with this conclusion. I would, however, apply my standard for assessing contract ambiguity to resolve this issue. *Supra* ¶ 127 (Lee, A.C.J., dissenting in part) ("[A] contract is 'ambiguous' enough to allow extrinsic evidence if and only if the parties' competing interpretations of a contract are equally (or at least roughly equally) plausible."). Doing so, I would conclude that the provision at issue is ambiguous because both interpretations are equally (or at least roughly equally) plausible for reasons highlighted by the majority. *See supra* ¶¶ 67–71. Because the provision is ambiguous, I would ask whether the district court's factual determination—which was based on a review of extrinsic evidence—is clearly erroneous. I do not believe it is for reasons stated by the majority. *Supra* ¶¶ 72–76. I thus agree with the majority's decision to affirm the district court's holding that the 10 percent late fee provision does not apply to the final balloon payment.

However, as to Part I of the majority opinion, I join Associate Chief Justice Lee's dissent in its conclusion that the district court erred when it did not find as a matter of law that the Note required the late fee to be paid to bring the Note "current." *Supra* ¶ 125. And yet, while I support much of the analysis in his dissenting opinion, I am not convinced that the court needs to define ambiguity as a situation where competing interpretations of a contract are roughly equal. *Supra* ¶ 127.

¶173 Regarding Part I of the majority opinion, as a threshold matter, I disagree with the conclusion announced in Part I.A and with the analysis set forth in paragraphs 47–51. I believe the language in paragraph 36 of the court of appeals' decision was clear—it *did make* a legal determination that the 10 percent late fee had to be paid to bring the Note current.[119] Whether the court should have made that legal determination is a different question, and one the Bradys perhaps would have asked us to reconsider had this court granted review. But it did not. *Brady v. Park*, 2013 UT App 97, 302 P.3d 1220, *cert. denied* 308 P.3d 536. Therefore, I would find that the clear language in paragraph 36 of the court of appeals' decision controls and that the district court violated the mandate rule by reaching a different conclusion.

¶174 But because the majority opinion concludes that the mandate rule was not violated, we must determine what level of ambiguity is sufficient to require a court to consider extrinsic evidence to determine the intent of the parties. On this point, I agree with Associate Chief Justice Lee that there is not sufficient ambiguity in the Note at issue in this case to require consideration of extrinsic evidence to interpret the contractual language on the issue of whether the Note requires payment of the 10 percent late fee to bring the Note current. Accordingly, I do not join Part I.B of the majority opinion.

---

[119] In the court of appeals' decision, the court declared that "the 20% default interest rate runs from the expiration of the five-day grace period until the payment was made, together with the 10% late fee (if the trial court determines on remand that the 10% late fee is enforceable)." *Brady v. Park*, 2013 UT App 97, ¶ 36, 302 P.3d 1220. On remand, the district court found that the 10 percent late fee is enforceable, a determination that has not been challenged in this appeal.

J. CONNORS, concurring in part and dissenting in part

¶175   However, I would not go so far as to require that the competing interpretations be roughly equal before opening the door to consideration of extrinsic evidence. To me this is not necessary to resolve the case at hand. Therefore, I do not join that aspect of Associate Chief Justice Lee's opinion.

¶176   Rather, I would conclude that only one interpretation of the contract at issue in this case is objectively reasonable. And it is the same reading the court of appeals endorsed in paragraph 36 of its decision. The competing interpretation—that the Note does not require the 10 percent late fee to be paid to bring the Note current—is simply not objectively reasonable in my view.[120] Therefore, rather than remand the case to the district court to consider extrinsic evidence on this issue, I would reverse with instructions to follow the only reasonable interpretation, which is that the Note requires the 10 percent late fee to be paid to bring the Note current.

¶177   Finally, I would also expressly disavow language found in earlier cases[121] that could be read to suggest that a proffered

---

[120] I find paragraphs 164–71 of Associate Chief Justice Lee's opinion particularly persuasive on this point. There is no need to repeat those arguments here.

[121] Some examples include: *Mind & Motion Utah Invs., LLC v. Celtic Bank Corp.*, 2016 UT 6, ¶ 24, 367 P.3d 994 ("Rather, the proffered alternative interpretations [of a contract] must be *plausible* and reasonable in light of the language used." (emphasis added) (internal quotation marks and citation omitted)); *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶¶ 15–18, 133 P.3d 428 (reciting a plausibility standard but then expressing some concern over the etymology of the word "plausible"); *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998) ("A contract may be ambiguous because it is unclear or omits terms or . . . 'if the terms used to express the intention of the parties may be understood to have two or more plausible meanings.'" (alteration in original) (quoting *Alf v. State Farm Fire & Cas. Co.*, 850 P.2d 1272, 1274 (Utah 1993))).

Even the court of appeals in its opinion in this case refers to a plausibility standard in its analysis of a different provision in this contract (a provision that is not at issue in the current appeal). *Brady*, 2013 UT App 97, ¶ 35 ("While we do not regard Park's interpretation and the Bradys' interpretation as equally *plausible*, we nevertheless

(Continued)

competing interpretation need only be "plausible"[122] to support a finding of ambiguity. I would emphasize that the competing interpretations must both be objectively reasonable before an ambiguity is found.[123]

———————

agree with the Bradys that the text of the Note forecloses neither." (emphasis added)).

[122] Merriam-Webster's defines "plausible" as "superficially fair, reasonable, or valuable but often specious." *Plausible*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (11th ed. 2003). And the Oxford English Dictionary defines "plausible" as "seeming reasonable or probable (though speculative); apparently acceptable or trustworthy (sometimes with the implication of mere appearance); specious." *Plausible*, SHORTER OXFORD ENGLISH DICTIONARY (6th ed. 2007). In my view, "plausibility" is too low a standard to support a conclusion of ambiguity when reviewing a contractual provision.

[123] Frankly, I believe this is the standard the court has already endorsed in its more recent pronouncements on the issue, including in the majority opinion in this case. *See supra* ¶ 54; *see also, e.g.*, *Utah State Tax Comm'n v. See's Candies, Inc.*, 2018 UT 57, ¶ 18, 435 P.3d 147 (explaining that in the process of statutory interpretation, statutory language is "ambiguous" only when "its terms remain susceptible to two or more *reasonable* interpretations after we have conducted a plain language analysis" (emphasis added)). However, I believe the court should specifically disavow any prior language supporting a plausibility standard in order to give contracting parties, the practicing bar, and the lower courts a clearer understanding of the standard.

In the case at hand, I disagree with the majority's application of its own standard. As indicated above, I conclude that only one of the competing interpretations is objectively reasonable. *Supra* ¶ 177. Therefore I find no ambiguity.